**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NISHA HANSINK, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>CHOWCHOW CLOUD INTERNATIONAL HOLDINGS LIMITED, YEE KAR WING, HUI WAI MING, WONG CHUNG WAI, US TIGER SECURITIES, INC., ASSENTSURE PAC, and JOHN DOES 1-100,<br><br>Defendants. | Case No: 1:26-cv-2063<br><br>**CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Plaintiff Nisha Hansink ("Plaintiff"), individually and on behalf of all others similarly situated (the "Class"), by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by ChowChow Cloud International Holdings Limited ("CHOW" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by CHOW; and (c) review of other publicly available information concerning CHOW and similar entities.

## I.    NATURE OF THE ACTION AND OVERVIEW

1.    This is a class action on behalf of persons and entities that purchased or otherwise acquired CHOW securities between September 16, 2025, and December 10, 2025, inclusive (the "Class Period"). Plaintiff pursues claims against CHOW, Yee Kar Wing, Hui Wai Ming, Wong Chung Wai, Assentsure PAC, and US Tiger Securities, Inc., as well as unidentified John Does 1-100, (the "Defendants"), under the Securities Exchange Act of 1934.

2.    The Company is a holding company incorporated in the Cayman Islands with operations conducted by indirect wholly-owned subsidiary, Sereno Cloud Solutions HK Limited in Hong Kong, a special administrative region of the People's Republic of China. The Company's operations are conducted in the Asia-Pacific region with a strong presence in Hong Kong and Singapore. The Company is purportedly a pioneer in providing one-stop cloud solutions that support companies across the IT industry value chain throughout their entire cloud transformation journey from consulting, deployment, and migration to cloud environmental building and management. The Company's business purportedly comprises: (i) digital transformation consulting services consisting primarily of cloud suitability assessment, real-time resource

management and strategic planning and advisory; (ii) professional IT services comprising a wide range of capabilities designed to facilitate seamless cloud integration and digital transformation; (iii) AI-powered proactive cloud managed services covering all aspects of day-to-day cloud maintenance and support; and (iv) IT infrastructure solutions covering on-premise private cloud setups and public cloud integrations including infrastructure applications such as the Company's Sereno Cloud App360 AI and Data Science Platform (the "AI & Data Science Platform"), which consists of several core components.

3.      During the Class Period, CHOW's principal executive offices were located at Unit 03, 23/F, Aitken Vanson Centre, No. 61 Hoi Yuen Road, Kwun Tong, Kowloon, Hong Kong. The Company completed its initial public offering on or around September 16, 2025, selling 2.6M ordinary shares at an offering price of $4.00 per share, raising $10.4M in gross proceeds.

4.      This case arises from the sudden collapse of CHOW's stock price on December 10, 2025, including multiple halts of trading by the New York Stock Exchange American Exchange (the "NYSE American") in the Company's securities due to volatility from market manipulation that caused the Company's stock price to surge following the IPO despite no fundamental change in profile, news or information from the Company. On that date, trading in the Company's stock was halted twice and its price suffered a collapse of 84.3% from a closing price of $11.70 per share on December 9, 2025, down to $1.83 per share at closing on December 10, 2025. Investigation and public reports have revealed that CHOW was a vehicle utilized in a market manipulation and "pump-and-dump" promotional scheme. As part of the scheme, impersonators acting as financial advisors touted CHOW in online forums, chat groups, and social media posts with baseless claims to create a buying frenzy amongst retail investors.

5.      Throughout the Class Period, Defendants made materially false and/or misleading statements and failed to disclose material adverse facts about the Company's business, operations, and the true nature of the trading activity in the securities. Specifically, Defendants failed to disclose to investors that: (1) CHOW was the subject of a market manipulation and fraudulent promotion scheme involving social-media based misinformation and impersonators posing as financial professionals; (2) CHOW's public statements and risk disclosures omitted any mention of the realized risk of fraudulent trading or market manipulation used to drive the Company's stock price; (3) that, as a result, CHOW securities were at unique risk of a sustained suspension in trading by NYSE American and severe volatility-induced decline; (4) that the sole underwriter on the IPO, Tiger Securities, had been fined and censured by the Financial Industry Regulatory Authority ("FINRA") in April 2025 for failing to have a reasonable system in place to identify potentially suspicious deposits of low-priced securities; and (5) as a result of the foregoing, Defendants' positive statements about the Company's business, operations and prospects were materially misleading and/or lacked a reasonable basis.

## II.    JURISDICTION AND VENUE

6.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

8.      Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in

substantial part, in this Judicial District. In addition, the Company's agent for service of process, Cogency Global Inc., ("Cogency") and the Underwriter Defendant (defined below) are located in this Judicial District. Cogency has offices located at 122 East 42nd Street, 18th Floor, New York, NY 10168.

9.      In connection with the acts, transactions, and conduct alleged herein, Defendants directly and/or indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.    PARTIES

10.     Plaintiff Nisha Hansink, as set forth in the accompanying certification, incorporated by reference herein, purchased CHOW securities during the Class Period, and suffered substantial damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

11.     Defendant CHOW is a Cayman Islands incorporated holding company with principal executive offices in Hong Kong. The Company's common stock traded on the NYSE American under the symbol "CHOW" during the Class Period.

12.     Defendant Yee Kar Wing ("Wing") is and was the Company's Chief Executive Officer and Chairman of the Board of Directors at all relevant times.

13.     Defendant Hui Wai Ming ("Ming") was the Company's Chief Operating Officer at all relevant times.

14.     Defendant Wong Chung Wai ("Wai") was the Company's Chief Financial Officer at all relevant times.

15.     Defendant Assentsure PAC ("Assentsure" or the "Auditor Defendant") has served as the Company's auditor since 2023.

4

16. Defendant US Tiger Securities Inc., ("Tiger Securities" or the "Underwriter Defendant") served as the Company's underwriter in connection with its IPO. Tiger Securities is headquartered within this District. On April 25, 2025, Tiger Securities, along with its securities broker affiliate TradeUP Securities Inc., was censured and fined by FINRA for failing to maintain proper anti-money laundering programs designed to detect and report potentially suspicious activity and transactions in thinly traded low-priced securities. Tiger Securities is located within this District and is a subsidiary of its Beijing, China-based parent Up Fintech Global Holdings, Ltd.

17. Defendants John Does 1-100 are co-conspirators in the market manipulation scheme, whose true identities can only be ascertained following discovery, but may include and are not limited to members of the so-called "Syndicate" as referred to in the SEC's court filings in *Peiyong v. U.S. Securities and Exchange Commission,* Case No. 1:25-mc-000350 (S.D.N.Y.) (ECF No. 7), as well as stock promoters using social media and messaging applications, and additional, unidentified underwriters involved in the stock manipulation scheme.

18. Defendants Wing, Ming, and Wai (collectively, the "Individual Defendants"), because of their positions within the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to the market. The Individual Defendants were provided with copies of the Company's public filings, reports, and press releases alleged herein to be materially misleading prior to, or shortly after, their issuance and had the ability, opportunity, and obligation to prevent their issuance or promptly correct them. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representation which was being made

were then materially false and/or misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

19.     The Auditor Defendant issued a clean audit opinion on the Company's financial statements incorporated into the Registration Statement issued in connection with the Company's September 16, 2025, IPO. Additionally, Defendant Assentsure was CHOW's auditor throughout and for years prior to the Class Period and had access to material non-public information. Because of its position, Assentsure knew or should have known that the adverse facts alleged herein had not been disclosed to and were being concealed from the investing public and that the positive representations being made were materially false and/or misleading. Furthermore, due to its position, Assentsure had the ability and opportunity to prevent issuance of fraudulent SEC filings or cause them to be corrected. Therefore, the Auditor Defendant is also liable for the materially false and misleading statements and omissions pleaded herein.

20.     The Underwriter Defendant was identified as the sole underwriter on the IPO at numerous points throughout the Prospectus (defined below) and signatory on the underwriting agreement (the "Underwriting Agreement"). The Underwriter Defendant, based on its position, had the ability and opportunity to prevent the issuance of fraudulent SEC filings and/or cause them to be corrected. With this authority and by acting as the sole underwriter, Plaintiff and the Class could and did reasonably attribute the materially misleading false statements and omissions contained in the Registration Statement (defined below) to the Underwriter Defendant and accordingly, the Underwriter Defendant is also liable for the false statements and omissions pleaded herein.

21.     The Underwriter Defendant has served as underwriter and/or sole book-runner in other recent IPOs of similar foreign, microcap companies that have experienced extreme price

volatility resulting in significant investors losses including, but not limited to DarkIris Inc., ("DarkIris") and Smart Digital Group Limited ("Smart Digital"). On September 26, 2025, trading in Smart Digital was halted by NASDAQ and after it resumed trading, the stock price declined 86.4% from an opening price of $13.61 per share down to $1.85 at close. Before the market opened on September 29, 2025, the SEC halted trading in Smart Digital securities through October 10, 2025, and then, on October 11, 2025, the NASDAQ suspended trading in Smart Digital securities pending an information request. The October 11, 2025, NASDAQ trading halt of Smart Digital remains in effect. On September 30, 2025, DarkIris was halted from trading by the NASDAQ and its stock declined from $10.43 per share at open down to close at $1.29 per share. Since then, DarkIris has mostly traded well below the $1.00 threshold required to maintain its listing on the NASDAQ.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Material Misstatements and Omissions Are Contained in CHOW's Registration Statement and Prospectus

22.    The Class Period begins on September 16, 2025, when the Company conducted its IPO and filed its Prospectus permitting the Company to issue 2.6 million ordinary shares at an initial offering price of $4.00 per share for a total capital raise of $10.4M (the "Prospectus"). In the Prospectus, which formed part of the registration statement filed in connection with the IPO (the "Registration Statement"), the Company provided the following overview of its business:

> We are a pioneer in providing one-stop cloud solutions that support companies across the IT industry value chain throughout their entire cloud transformation journey from consulting, deployment and migration to cloud environment building and management. We were founded in December 2014 by a group of passionate and experienced professionals, who envisioned the potential of cloud technology to transform the way businesses of various sizes operate. Recognizing the growing need for digitization and the benefits that cloud technology could bring to businesses, our founders set out to

7

create a company that would bridge the gap between cloud services providers and companies who seek to move to the cloud.

Our business primarily comprises (i) digital transformation consulting services consisting primarily of cloud suitability assessment, real-time resource management and strategic planning and advisory, (ii) professional IT services comprising a wide range of capabilities designed to facilitate seamless cloud integration and digital transformation, (iii) AI-powered proactive cloud managed services covering all aspects of day-to-day cloud maintenance and support, and (iv) IT infrastructure solutions covering on-premise private cloud setups and public cloud integrations, leveraging (including) our Sereno Cloud App360 AI and Data Science Platform (the "AI & Data Science Platform").

We have experienced a substantial growth in financial performance recently. Our revenue increased by 28.6% from HK$141.4 million in 2023 to HK$181.8 million (US$23.3 million) in 2024.

23. The Prospectus also contained financial results for fiscal 2023 and 2024, as well as the Report of Independent Registered Public Accounting Firm signed by Defendant Assentsure regarding those financial results. Specifically, Defendant Assentsure reported the following:

**Opinion on the Financial Statements**
We have audited the accompanying consolidated balance sheets of ChowChow Cloud International Holdings Limited and its subsidiaries (collectively, the "Company") as of December 31, 2024 and 2023, the related consolidated statements of operations and comprehensive income, changes in equity and cash flows for the years ended December 31, 2024 and 2023 and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial positions of the Company as of December 31, 2024 and 2023 and the results of its operations and its cash flows for the years ended December 31, 2024 and 2023, in conformity with accounting principles generally accepted in the United States of America.

**Basis for Opinion**
These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the Public

8

Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits, we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/Assentsure PAC

We have served as the Company's auditor since 2024.

Singapore
May 28, 2025
PCAOB ID Number: 6783

24.     The Prospectus also provided information regarding the Company's purported

"Competitive Strengths[,]" which included the following:

We believe that the following competitive strengths have contributed to our success and differentiated us from our competitors:

● dual capabilities in cloud services and IT services;

9

- strong geographic presence and local expertise in Asia-Pacific;

- established partnerships with major cloud and technology service providers;

- diverse and extensive customer base; and

- agility and responsiveness to market and technology changes.

25. The Prospectus also addressed the Company's purported "Growth Strategies[,]"

stating as follows:

> We intend to develop our business and strengthen brand loyalty by implementing the following strategies:
>
> - expand our footprints in the Asia-Pacific region and globally;
>
> - growth through strategic acquisitions;
>
> - enhance our service capabilities and expand our service offerings;
>
> - maintain strong relationships with existing partners and establish new collaborations; and
>
> - invest in and continue to adopt cutting-edge cloud technology and AI.

26. The Prospectus also included vague, boilerplate disclosures regarding risk factors

that could hypothetically adversely affect the Company and its investors including the following:

> ***Volatility in the price of our Ordinary Shares may subject us to securities litigation.***
>
> The market for our Ordinary Shares may have, when compared to seasoned issuers, significant price volatility and we expect that our share price may continue to be more volatile than that of a seasoned issuer for the indefinite future. In the past, plaintiffs have often initiated securities class action litigation against a company following periods of volatility in the market price of its securities. We may, in the future, be the target of similar litigation. Securities litigation could result in substantial costs and liabilities and could divert management's attention and resources.

\*                         \*                         \*

***We may experience extreme stock price volatility unrelated to our actual or expected operating performance, financial condition or prospects, making it difficult for prospective investors to assess the rapidly changing value of our Ordinary Shares.***

Recently, there have been instances of extreme stock price run-ups followed by rapid price declines and strong stock price volatility with a number of recent initial public offerings, especially among companies with relatively smaller public floats. As a relatively small-capitalization company with relatively small public float, we may experience greater stock price volatility, extreme price run-ups, lower trading volume and less liquidity than large-capitalization companies. In particular, our Ordinary Shares may be subject to rapid and substantial price volatility, low volumes of trades and large spreads in bid and ask prices. Such volatility, including any stock-run up, may be unrelated to our actual or expected operating performance, financial condition or prospects, making it difficult for prospective investors to assess the rapidly changing value of our Ordinary Shares.

In addition, if the trading volumes of our Ordinary Shares are low, persons buying or selling in relatively small quantities may easily influence prices of our Ordinary Shares. This low volume of trades could also cause the price of our Ordinary Shares to fluctuate greatly, with large percentage changes in price occurring in any trading day session. Holders of our Ordinary Shares may also not be able to readily liquidate their investment or may be forced to sell at depressed prices due to low volume trading. Broad market fluctuations and general economic and political conditions may also adversely affect the market price of our Ordinary Shares. As a result of this volatility, investors may experience losses on their investment in our Ordinary Shares. A decline in the market price of our Ordinary Shares also could adversely affect our ability to issue additional Ordinary Shares or other securities and our ability to obtain additional financing in the future. No assurance can be given that an active market in our Ordinary Shares will develop or be sustained. If an active market does not develop, holders of our Ordinary Shares may be unable to readily sell the Ordinary Shares they hold or may not be able to sell their Ordinary Shares at all.

27.     With respect to the reasons behind the Company's IPO, the Prospectus stated the following regarding its intentions post-IPO and how it would use the IPO net proceeds:

We estimate that we will receive net proceeds from this offering of approximately US$7.9 million, or approximately US$9.3 million if the underwriter exercises its option to purchase additional Ordinary Shares in full, after deducting underwriting discounts and commissions and the estimated offering expenses payable by us. These estimates are based upon an initial offering price of US$4.00 per Ordinary Share.

The primary purposes of this offering are to create a public market for our shares for the benefit of all shareholders, retain talented employees by providing them with equity incentives and obtain additional capital. We plan to use the net proceeds of this offering as follows:

○     10% of the net proceeds for expanding service capabilities and R&D;

○     10% of the net proceeds for marketing and branding;

○     50% of the net proceeds for potential mergers and acquisitions although we have no commitments with respect to any such acquisitions at this time; and

○     the remainder for working capital and other general corporate purposes.

The foregoing represents our current intentions based upon our present plans and business conditions to use and allocate the net proceeds of this offering. Our management, however, will have significant flexibility and discretion to apply the net proceeds of this offering. If an unforeseen event occurs or business conditions change, we may use the proceeds of this offering differently than as described in this prospectus. See "Risk Factors — Risks Related to the Ordinary Shares and This Offering — We have broad discretion in the use of the net proceeds from this offering and may not use them effectively."

Pending any use described above, we plan to invest the net proceeds in short-term, interest-bearing, debt instruments or demand deposits.

28.    The statements identified above in paragraphs 22 through 27 were and are false and misleading because the statements failed to disclose that: (1) CHOW was the subject of a market manipulation and fraudulent promotion scheme involving social-media based misinformation and impersonators posing as financial professionals; (2) CHOW's public statements and risk disclosures omitted any mention of the realized risk of fraudulent trading or market manipulation used to drive the Company's stock price; (3) that, as a result, CHOW securities were at unique risk of a sustained suspension in trading by NYSE American and severe volatility-induced decline; (4) that the sole underwriter on the IPO, Tiger Securities, had been fined and censured by FINRA in April 2025 for failing to have a reasonable system in place to identify potentially suspicious deposits of low-priced securities; and (5) as a result of the foregoing, Defendants' positive statements about the Company's business, operations and prospects were materially misleading and/or lacked a reasonable basis.

29.    Each of the Individual Defendants signed the Registration Statement. The Prospectus contains the signature of the Auditor Defendant with respect to its opinion and report on the Company's financial statements. The Prospectus identifies Tiger Securities as the "underwriter" for the IPO and Tiger Securities was a party and the sole signatory to the Underwriting Agreement, which was submitted as Exhibit 1.1 to the Form F.1/A Registration Statement filed by the Company on September 2, 2025, mere weeks before the Company's IPO. The Underwriting Agreement expressly provides in pertinent part in Section 4(b) under the heading Covenants of the Company that:

> During the period beginning on the date hereof and ending on the later of the Closing Date or such date as, in the reasonable opinion of Underwriters' Counsel, the Prospectus is no longer required by law to be delivered (or in lieu thereof the notice referred to in Rule 173(a) under the Securities Act is no longer required to be provided) in connection with sale by an underwriter or dealer (the "**Prospectus**

**Delivery Period**"), prior to amending or supplementing the Registration Statement, the Disclosure Materials or the Prospectus, the Company shall furnish to the Underwriters and Underwriters' Counsel for review a copy of each such proposed amendment or supplement, and the Company shall not file any such proposed amendment or supplement to which the Underwriters reasonably object.

Accordingly, the Underwriter Defendant had the opportunity to review the Registration Statement and Prospectus publicly filed with the SEC.

### B.   Erratic Trading Volume in CHOW Following the IPO

30.   The Company's low-float IPO appears to have been carefully designed to facilitate market manipulation and a "pump-and-dump" scheme. By offering just 2.6 million shares to the public, fraudulent actors were able to benefit from the scheme through offshore holding entities and affiliates. The scarce public float allowed for price manipulation because even modest buying pressure could create explosive price movement.

31.   On its first trading day, September 16, 2025, the Company's ordinary shares opened for trading at double the IPO price, $8.00 per share, surged to an intraday high of $21.91 per share, before closing at $12.61 per share, more than triple the IPO price on volume of 1.4 million.

32.   However, on September 17, 2025, CHOW's ordinary shares suffered a setback, declining from an opening price of $11.40 per share to a closing price of $8.50 per share on trading volume of 245,100.

33.   After the market closed on September 17, 2025, CHOW issued a press release announcing the closing of its IPO of 2.99M ordinary shares, including 390,000 over-allotment shares, at a price of $4.00 per share for total gross proceeds of $11.96M. The press release also identified Defendant Tiger Securities as the sole book-running manager for the offering. The press release did not mention anything regarding the extreme price activity or heavy trading volume seen in the stock's activity in the first two trading days.

14

34.     The price decline continued over the next two trading days. On September 18, 2025, CHOW's stock price declined from an opening price of $8.50 per share down to $5.38 per share at closing on trading volume in excess of 900,000. Finally, on September 19, 2025, CHOW's stock price bottomed out from its initial surge closing at $5.01 per share on trading volume of over 1.7 million.

35.     Following the IPO, the initial surge and decline in the Company's stock, trading volume in CHOW plummeted. From the next trading day, September 22, 2025, through September 29, 2025, CHOW's daily trading volume averaged just under 210,000 per day with CHOW's stock closing at $5.31 per share on September 29, 2025.

36.     On September 30, 2025, CHOW stock price surged to an intraday high of $7.62 per share before closing at $6.49 per share on trading volume of 888,900, more than a four-fold increase from the average trading volume the week prior. Then, October 1, 2025, CHOW's stock price surged again to an intraday high of $8.00 per share and a closing price $7.10, on trading volume over one million, a nearly five-fold increase from the average trading volume from September 22, 2025, through September 29, 2025. This two-day surge in volume caused CHOW's stock price to rise more than 33% over the two trading days.

37.     The Company's ordinary shares fluctuated in that range for the next two weeks with trading volumes between the high of 759,000 on October 2, 2025, and a low of 401,700 on October 13, 2025.

38.     After reaching an intraday high price of $9.44 per share on October 15, 2025, on trading volume of 756,800, the Company experienced a collapse in volume on October 16, 2025, with the stock price shrinking to $6.85 per share on trading volume of just 66,700 – a more than eleven-fold decrease from the prior day. From October 16, 2025, through October 22, 2025,

15

encompassing five trading days, the average trading volume of CHOW ordinary shares was just 65,460, with CHOW's stock price declining to a closing price of $6.25 per share on at closing on October 22, 2025.

39.    Then, on October 23, 2025, in the absence of any news regarding or filing from the Company, CHOW's stock price began to climb, reaching an intraday high of $7.51 per share and closing at $7.07 per share on trading volume of 424,600, a more than six-fold increase in the trading volume from the average of the five trading days prior.

40.    On October 24, 2025, the Company's stock pushed higher again with an intraday high of $8.32 per share and closing at $7.96 per share on trading volume of 413,700, which again represented a six-fold increase in the daily trading volume from October 16, 2025, through October 22, 2025. Trading volume would continue to push the stock higher over the next week with CHOW shares reaching an intraday high of $10.22 per share and closing price of $9.90 per share on October 29, 2025, on trading volume of 446,700. Then, on October 30, 2025, the Company's stock price would reach an intraday high of $11.00 per share before declining to $9.46 per share at closing on 434,800 trading volume.

41.    At that point, on October 31, 2025, CHOW's stock price declined to a closing price of $8.42 per share and sunk as low as $8.30 per share on volume exceeding 1.4 million. The trading volume on October 31, 2025, represented more than a twenty-one-fold increase compared to average trading volume from October 16, 2025, through October 22, 2025, despite no material news or filings from the Company. From that date forward through the end of the Class Period, CHOW's ordinary shares would never have a daily trading volume beneath 358,200.

16

**C.    Market Manipulation Scheme Drives CHOW's Volume and Stock Price Activity**

42.    Although public filings and news were scarce, a coordinated effort was made on social media and messaging applications, such as WhatsApp, to "pump" the price of CHOW's ordinary shares led by stock promoters illegitimately posing as financial advisors. Based on information and belief, these stock promoters, among the John Does 1-100 Defendants, used aliases and false photographs to conceal their true identities and were key cogs in the stock manipulation scheme surrounding CHOW, along with Defendants identified herein.

43.    These stock promoters targeted investors on social media via advertisements and posts, which solicited them to join a stock trading and tips "groups" on messaging applications. After an initial solicitation, when an investor contacted the group about joining, a stock promoter posing as a financial advisor would tout prior returns to convince the investor to follow their advice and join the group. Along with touting these results, the stock promoters advertised new investment opportunities, such as CHOW, and emphasizing the expectation that investment would return profits of "120%-150%."

44.    Once the investor joined the group, a stock promoter, posing as a financial advisor, would provide false and misleading information regarding the Company's stock and its potential, and encourage the investor to "maximize" their funds to achieve the largest profit. When investors confirmed that they purchased stock as instructed by the stock promoters, the stock promoter instructed the investor to provide screenshots of their transactions illustrating their ownership of CHOW. For example, these messages from stock promoters included and were similar to the following:





45.    These stock promoters also provided investors with memoranda concerning CHOW, which were materially false and misleading. For example, one memorandum told investors that CHOW was fundamentally strong and poised for growth stating, in pertinent part, that: "From a fundamental perspective, [CHOW] has not only established a strong presence in the local market through diversified business development, but has also achieved significant results in expanding into multiple strategic regions. During 2024-2025, the company recorded stable

19

revenues across several Asia-Pacific markets, and the European and American markets will become major areas of strategic deployment in 2026." Furthermore, in their memoranda, the so-called "advisors" would support these claims by indicating that the "advisors" would "***conduct in-depth engagements with [CHOW's] [B]oard [of Directors] and senior management*** to learn about its current revenue situation and future development scope." (Emphasis added.). The memoranda solicited investment in CHOW, touting an expected "investment return target of 120%-150%[,]" a "forecast range" described as "entirely reasonable."

46.     Following the "in-depth engagements with [CHOW's B]oard [of Directors] and senior management[,]" the stock promoters provided another memorandum, which included detailed information about the Company's "Revenue Growth Engines[,]" "Global Business Expansion Strategy[," and "Capital Operations to Drive Growth[.]"

47.     The memorandum discussed CHOW's "Revenue Growth Engines" including the intention to add "value added services including 'AI operations monitoring' and 'cost optimization analysis' raising single-customer ARPU (average revenue per use) from approximately USD 100,000 in 2025 to USD 250,000 by 2028." Further, the memorandum emphasized the plan to "[d]evelop an 'intelligent cloud resource scheduling platform,' utilizing AI algorithms to achieve automatic server load optimization and fault prediction, raising gross margin to over 60%."

48.     According to the memorandum, the Company's "Global Business Expansion Strategy" included the intention "[i]n 2026, [to] establish a European headquarters in London, UK, with a focus on serving small and medium-sized businesses (SMBs) and cross-border e-commerce clients," "'indirect entry'" in the U.S. "through local partners" by forming "strategic alliances with U.S. small and medium-sized cloud consulting firms (such as Cloudreach, which specializes in vertical industries), providing them with Asia-Pacific cross-region service support while

leveraging their channels to enter the U.S. market[,]" and the implementation of a "'3+2+N' strategy" in the Asia-Pacific region aimed at "[d]eep cultivation of three core markets … in Hong Kong, Singapore, and Australia," "[b]reakthrough[s] in two potential markets" via "[f]ocused entry into Indonesia and Vietnam" by "leveraging local digital economy policy dividends[,]" and penetration into "emerging markets" like "Malaysia, Thailand and other markets through a 'light-asset cooperation model.'"

49.     The memorandum also explained how CHOW would use "Capital Operations to Drive Growth" through "Strategic Financing[,]" "M&A Integration[,]" "M&A Synergy Effects" and "Exploration of Top-tier Partnerships[,] and "ESG Value Realization." Specifically, the memorandum explained that the Company aimed to "[i]mplement a dual-track strategy of 'targeted acquisitions + ecosystem synergy' in 2027-2028, reaching deep strategic cooperation with well-known industry peers to achieve mutual growth through resource exchange[.]" The Company's strategies included "[r]apidly obtain[ing] international certifications such as ISO 27701 through acquisitions" and "converting target customers into CHOW 'basic services + value -added solutions' composite users, with a goal of achieving a 35% customer conversion rate with 12 months post-acquisition."

50.     Based on these plans, the memorandum predicted that "[b]y focusing on 'globalization + differentiation + technological upgrade,' [CHOW] is expected achieve leapfrog growth in market capitalization and revenue over the next 3-5 years, becoming a leading cloud solutions provider in Asia-Pacific with a global presence."

51.     The statements identified above in paragraphs 44 through 50 were and are false and misleading because the statements failed to disclose that: (1) CHOW was the subject of a market manipulation and fraudulent promotion scheme involving social-media based misinformation and

impersonators posing as financial professionals; (2) CHOW's public statements and risk disclosures omitted any mention of the realized risk of fraudulent trading or market manipulation used to drive the Company's stock price; (3) that, as a result, CHOW securities were at unique risk of a sustained suspension in trading by NYSE American and severe volatility-induced decline; (4) that the sole underwriter on the IPO, Tiger Securities, had been fined and censured by FINRA in April 2025 for failing to have a reasonable system in place to identify potentially suspicious deposits of low-priced securities; and (5) as a result of the foregoing, Defendants' positive statements about the Company's business, operations and prospects were materially misleading and/or lacked a reasonable basis.

52.    Further, despite the extreme and eccentric pricing and volume activity in the Company's stock, and advertised stock promotion campaign targeting stocks similar to CHOW, Defendants did not warn investors of the materialized risk that CHOW's ordinary shares were the subject of a market manipulation scheme designed to "pump and dump" the Company's shares and leave investors with staggering losses.

**D.     Regulators Take Aim at Companies Similar to CHOW**

53.    While the market manipulation scheme was being prepared and in the weeks leading up to and following CHOW's IPO, regulators were aligning their efforts to curtail such manipulation on U.S. stock exchanges.

54.    On September 3, 2025, the NASDAQ issued a press release entitled "NASDAQ PROPOSED CHANGES TO ITS LISTING STANDARDS[,]" in which NASDAQ announced proposals aimed at regulating micro-cap, low public float companies, like CHOW, which had increasingly become vehicles of fraud. The press release stated the following in pertinent part:

> Today, Nasdaq proposed a new set of enhancements to its initial and
> continued   listing   standards,   reinforcing   its   long-standing

22

commitment to capital formation while ensuring investor protection and upholding market integrity. These proposed updates introduce enhanced requirements for minimum company public float and capital raised during initial public offerings, alongside stricter suspension and delisting procedures for companies failing to meet Nasdaq's continued listings standards.

The revised standards include:

- A $15 million minimum market value of public float, applicable to new listings on Nasdaq under the net income standard.

- An accelerated process for suspending and delisting companies with a listings deficiency that also have a Market Value of Listed Securities below $5 million.

- A $25 million minimum public offering proceeds requirement for new listings of companies principally operating in China.

"*Investor protection and market integrity are central to Nasdaq's mission*," said John Zecca, Executive Vice President and Global Chief Legal, Risk & Regulatory Officer. "These enhancements reflect our ongoing commitment to evolve our standards in step with market realities and to lead by example in promoting fair and orderly markets. By increasing our standards for the minimum public float and the public offering raise in certain new listings, it provides a healthier liquidity profile for public investors, while still making emerging companies available to investors through our exchange. These new listing standards represent one step in a necessary, industry-wide effort—alongside regulators, U.S. exchanges, and market participants—to closely examine trading behaviors in small company securities, with the goal of safeguarding market integrity and enhancing protections for investors."

*The actions announced today follow Nasdaq's proactive review of trading activity, particularly emerging patterns associated with potential pump-and-dump schemes in U.S. cross-market trading environments.* The proposed updates are also reflective of how market dynamics and company valuations have evolved over time, prompting the need to recalibrate Nasdaq's minimum liquidity standards to suit today's environment. These enhancements ensure that the thresholds for public listings remain relevant and effective as markets evolve.

23

As part of these changes, Nasdaq is reintroducing a minimum public offering proceeds requirement specifically for companies principally operating in China, building on previous standards set for "restrictive markets," in which the Public Company Accounting Oversight Board (PCAOB) could not inspect auditors.[1] By applying this threshold, Nasdaq strengthens investor protections and enhances the liquidity profile of companies to reflect today's market environment.

In addition to the enhanced listing standards, *Nasdaq will continue to actively refer cases to the Securities and Exchange Commission (SEC) and the Financial Industry Regulatory Authority (FINRA) on potentially manipulative trading activities, while strengthening our cooperation with both domestic and international regulators to reinforce effective oversight and maintain high standards across U.S. markets.*

(Emphasis added.)

55.    On September 5, 2025, the SEC issued a press release, which announced "the formation of a task force that will strengthen and enhance the Division of Enforcement's efforts to identify and combat cross-border fraud harming U.S. investors." In the release, the SEC explained, in pertinent part, that "[t]he Cross-Border Task Force will focus initially on investigating potential U.S. federal securities laws violations related to foreign-based companies, including potential market manipulation, such as 'pump-and-dump' and 'ramp-and-dump' schemes."

56.    On September 12, 2025, the U.S. Department of Justice ("DOJ") issued a press release entitled "Co-CEO of Chinese Publicly Traded Technology Company and Financial Advisor Indicted for Over $100M Securities Fraud Scheme," which stated the following, in pertinent part:

According to the indictment, Lai Kui Sen is the co-CEO of OST, and Yan Zhao, who goes by the aliases Hank Shi and Hank Shu, among others, is a financial advisor. *OST is a Cayman Islands company with its principal operations in China*, that claimed to be a manufacturer of display modules used in consumer electronics, commercial LCD displays, and automotive displays. OST is

publicly traded on NASDAQ and operated, at one point, with a variable interest entity (VIE) investment structure, which is often used by Chinese companies.

According to the indictment, Sen, Zhao, and others allegedly engaged in a ***complex scheme to first provide a group of fifteen co-conspirators with tens of millions of OST shares through two non-bona fide securities transactions.*** In one of these transactions, these co-conspirators paid nothing to OST for more than 70 million OST shares.

The indictment alleges that, ***on April 15, 2025, the same day that the select investors received their first tranche of heavily discounted OST shares, a fraudulent campaign began to artificially inflate the price and trading volume of the OST stock. This included promoting the stock by impersonating real investment advisors, among others, promoting the stock on social media, and creating a false impression of market-wide buying momentum.*** To capitalize on OST's artificial price inflation and to harm the victim investors, Zhao and Sen facilitated the opening of brokerage accounts for certain select investors and orchestrated the selling of the shares that they had received either heavily discounted or for no remuneration. ***These sales generated substantial profits of approximately more than $110 million.  Ultimately, according to the indictment, unwitting investors suffered significant losses when, on June 26, 2025, OST lost over $950 million in market capitalization, representing over 94% of its value.***

(Emphasis added.)

57.    On September 17, 2025, the SEC filed its Verified Opposition to Petitioner's Motion to Quash Subpoena under the Right to Financial Privacy Act of 1978 in the matter of *Peiyong v. U.S. Securities and Exchange Commission*, Case No. 1:25-mc-00350 (S.D.N.Y.) (ECF No. 7).[1]  Therein, the SEC stated the following, in pertinent part:

---

[1] On January 13, 2023, the SEC issued a Formal Order Directing Private Investigation and Designating Officers to Take Testimony in *In the Matter of Market Manipulation in Certain IPOs* (HO-14588) (the "Formal Order"). The Formal Order states that the SEC has information that tends to show that "U.S. Broker Dealers[,]" "Issuers[,]" "Hong Kong Broker-Dealers[,]" and "other persons and entities" may have been or may be engaging in violations of the federal securities laws including Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

> SEC Staff is investigating whether ***dozens of IPOs registered with the SEC and trading on U.S. exchanges between 2020 and 2025 (the "Relevant Offerings") were used as vehicles in a suspected IPO manipulation scheme ("Suspected IPO Manipulation Scheme") orchestrated by the persons and entities with ties to Hong Kong and China (the "Syndicate").*** In the days, weeks, and/or months following its IPO, each issuer's securities ***experienced unusual, extreme, and unexplained price movements, generally consisting of a large upward price spike followed by a drop to a price far below the high and often below the offering price.*** Today, these issuers' securities typically trade at a fraction of the offering price.
>
> SEC Staff's investigation indicates that ***the unusual price movements following the Relevant Offerings may have resulted from illegal market manipulation that the Syndicate orchestrated.*** Specifically, SEC Staff has information that tends to show that:
>
> • individuals and entities affiliated with the Syndicate acquired most of the issuers' public float by purchasing shares in many Relevant Offerings;
>
> • shortly after the Relevant Offerings, anonymous third parties on the Internet convinced investors to purchase the issuers' securities at prices substantially higher than they were offered; and
>
> • the accounts under the Syndicate's control that participated in the Relevant Offerings sold the issuers' shares at a significant profit into the bubble the solicitations created.
>
> (Emphasis added.)

58. Later, on October 7, 2025, United States District Court Judge Dale E. Ho denied the Motion to Quash and granted enforcement of the subpoena. In his Memorandum Order, Judge Ho explained that the SEC clearly linked the petitioner to its investigations, noting that the petitioner "appears to have also received significant proceeds from the Suspected IPO Manipulation scheme from other suspected [scheme] members," including "an entity in which [he] purchased a 40% ownership interest in," and that one alleged entity connected with the scheme

26

"disbursed a significant portion of . . . funds to other accounts related to Petitioner," including "one of [his] personal bank accounts."[2] *Peiyong*, (ECF No. 8).

59.     Accordingly, regulators identified companies with a similar profile to CHOW - recently IPOed, micro-cap companies with ties to Singapore and Hong Kong, and miniscule public floats - as, at minimum, problematic for investors, and at most, vehicles specifically designed to deceive investors, commit securities fraud, and market manipulation. Further, the SEC and DOJ are actively investigating and pursuing enforcement proceedings against potential co-conspirators and perpetrators of securities fraud via an IPO stock manipulation scheme similar to that alleged herein.

60.     Despite heightened regulatory activity with respect to similar stocks and activity within those stocks, Defendants were silent on the materialized risk that CHOW's ordinary shares were the subject of a market manipulation scheme designed to "pump and dump" the Company's shares and leave investors with staggering losses.

61.     Indeed, the Company's last public filing during the Class Period came on October 31, 2025, when CHOW filed a Current Report on Form 6-K announcing that Chang Hong-Ze was appointed as an executive director of the Company. From that date through to the end of the Class Period, the Company and the Individual Defendants were radio silent on the manipulation of the Company's stock despite record-breaking and erratic trading volumes.  Since the end of the Class Period, Chow's stock has traded below $1.00.

---

[2] At this time, Plaintiff lacks sufficient information linking Han Peiyong or his affiliates directly to CHOW and accordingly, cannot name Mr. Peiyong in connection with this Complaint. However, discovery could yield more information regarding Mr. Peiyong's (or others') involvement in the alleged violations of law specific to CHOW and in turn, Mr. Peiyong and/or his affiliates (or other similar persons and affiliates) could be named as a Defendant or Defendants in an amended pleading.

**D.      A Company Connected to Tiger Securities is Halted from Trading**

62.      On or around May 5, 2025, Smart Digital, a Cayman Islands holding company with significant ties to both Singapore and Hong Kong, conducted its IPO of 1.5 million ordinary shares at an offering price of $4.00 per share for a total capital raise of $6M. Defendant Tiger Securities was lead underwriter and book-runner in connection with the Smart Digital IPO.

63.      On September 26, 2025, Smart Digital had its stock halted from trading by the NASDAQ at 9:34 AM due to volatility. NASDAQ permitted trading to resume at 10:49 AM. When Smart Digital's stock resumed trading, its stock price plunged to just $2.27 per share before eventually closing at $1.85 per share on record daily trading volume of 25.9M. On the crash, Smart Digital's stock price lost 88% of its value from its prior day closing price of $13.61.

64.      After the market's close on September 26, 2025, the SEC announced "the temporary suspension, pursuant to Section 12(k) of the Securities Exchange Act of 1934, of trading in the securities of Smart Digital Group Limited[.]" The SEC explained that the temporary suspension was due to "potential manipulation in the securities of [Smart Digital] effectuated through recommendations made to investors by unknown persons via social media to purchase the securities of [Smart Digital], which appear to be designed to artificially inflate the price and volume of the securities of [Smart Digital.]" The suspension of trading in Smart Digital was ordered for the period from 4:00 AM EST on September 29, 2025, through 11:59 PM EST on October 10, 2025.

65.      On October 11, 2025, the NASDAQ announced that trading in Smart Digital would remain suspended pending receipt of "additional information requested from the company." Despite the Company's denial of involvement in market manipulation and statement that it intends to "fully cooperate with both the SEC and Nasdaq[,]" trading in Smart Digital's stock remains

28

halted by the NASDAQ pending the information request, which was first issued on September 30, 2025.

66.    There are a number of similarities between CHOW and Smart Digital. Both companies recently completed microcap IPOs and have ties to Singapore and Hong Kong. Both CHOW and Smart Digital experienced price and volume spikes unrelated to any news about or filings by the respective companies. CHOW and Smart Digital both retained auditors based in Singapore in connection with their IPOs. CHOW and Smart Digital were both subject to a market manipulation scheme on social media aimed at pumping and dumping the respective stocks to the detriment of each company's investors. Both companies' investors suffered catastrophic losses following trading halts. Further, both CHOW and Smart Digital had the same lead underwriter and book-runner in connection with their respective IPOs – Defendant Tiger Securities.

67.    Despite the collapse and halting of Smart Digital and the obvious similarities between the two companies, especially with respect to the retention of Tiger Securities in connection with the respective IPOs, Defendants did not warn investors of the materialized risk that CHOW's ordinary shares were the subject of a market manipulation scheme designed to "pump and dump" the Company's shares and leave investors with staggering losses.

### E.    CHOW Ordinary Share Price and Volume Surge Before the Truth is Revealed

68.    Over the twenty-four trading days between October 31, 2025, and December 5, 2025, the Company's ordinary shares had an average daily trading volume of 648,442. On December 5, 2025, the price of CHOW ordinary shares closed at $9.48 per share on trading volume of 527,000.

69.    On December 8, 2025, the price of CHOW ordinary shares surged to a closing price of $11.20 per share, a one-day increase of 18.1% despite the absence of any news relating to or

filing by the Company. Then-record trading volume of over nine million, a near fourteen-fold increase over average trading volume between October 31, 2025, and December 5, 2025, drove the surge in stock price. One measure of stock trading volatility is float-to-trading-volume ratio, also known as float rotation or float turnover. A ratio above 1.0 (or 100% turnover) is indicative of high volatility in a stock. On December 8, 2025, CHOW ordinary shares experienced a ratio of 3.01.

70.    On the next day, December 9, 2025, the Company's stock price increased again, gaining $0.50 per share and closing at $11.70 per share on trading volume of over 6.5 million, its second largest daily trading volume day, even with no news or publics filings from the Company. On this date, CHOW ordinary shares were again extremely volatile with a float turnover ratio of 2.18.

71.    Defendants were silent again despite the surge in pricing activity and volume in the absence of any news concerning, or filings by the Company. Defendants did not warn investors of the materialized risk that CHOW's ordinary shares were the subject of a market manipulation scheme designed to "pump and dump" the Company's shares and leave investors with staggering losses.

72.    On December 10, 2025, the pump-and-dump scheme was revealed with catastrophic losses to investors. At approximately 11:05 AM EST, a surge of sell orders and volume of approximately 360,000 caused the price of CHOW ordinary shares to plummet from $11.95 per share to $10.59 per share in a span of mere minutes. At 11:07 AM EST, NYSE American halted CHOW ordinary shares from trading due to volatility. The halt remained in effect until 12.37 PM EST when the stock reopened for trading at the price of approximately $1.00 per share. NYSE American halted CHOW ordinary shares for a second time from 3:44 PM EST until

3:49 PM EST before ultimately closing at $1.83 per share, a single day loss of 84.3%. On this date, CHOW ordinary shares experienced just under 13.5 million in daily trading volume, an astonishing float turnover ratio of 4.51.

73.    On the next day, December 11, 2025, the Company issued a press release, stating that "the Company had become aware of unusual trading activity in its ordinary shares on the [NYSE American] on December 10 and December 11, 2025." CHOW also stated that it "made inquiries and has been unable to determine whether corrective actions are appropriate at this time." The Company then announced "that there has been no material development in its business and affairs not previously disclosed or, to its knowledge, any other reason to account for the unusual market action."

## V.    AUDITOR DEFENDANT ALLEGATIONS

74.    The Auditor Defendant certified in the Prospectus and as part of the Registration Statement that "[i]n our opinion, the consolidated financial statements present fairly, in all material respects, the financial positions of the Company as of December 31, 2024 and 2023 and the results of its operations and its cash flows for the years ended December 31, 2024 and 2023, in conformity with the accounting principles generally accepted in the United States of America." Additionally, the Auditor Defendant stated the following:

> Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statement. We believe that our audits provide a reasonable basis for our opinion.

31

75.    In issuing its audit opinion on CHOW's financial statements, the Auditor Defendant failed to comply with U.S. Generally Accepted Accounting Principles ("GAAP") or the standards of the Public Certified Accounting Oversight Board ("PCAOB") requirements. These standards required the Auditor Defendant to exercise due professional care in the performance of the audit and to obtain competent, sufficient evidentiary matter to form a basis for their opinion, and to obtain reasonable assurances that the financial statements were free from material misstatement, whether caused by error or fraud.

76.    In conducting its audits, the Auditor Defendant had access to the files and key employees of the Company at all relevant times. The Auditor Defendant had continuous access to and knowledge of the Company's confidential internal, corporate, financial, operating and business information, and had the opportunity to observe and review CHOW's business and accounting practices, and to test the Company's internal accounting information and publicly reported financial statements. Accordingly, the Audit Defendant was aware of the significant deficiencies at the Company. Thus, if the Auditor Defendant had complied with PCAOB standards, it would have determined that there was no reasonable basis for its audit report because, among other things, the Auditor Defendant was aware of undisclosed facts tending to seriously undermine the accuracy of its audit report and conformity with GAAP and the Company's reported financial metrics.

## VI.    CLASS ACTION ALLEGATIONS

77.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired CHOW securities between September 16, 2025, and December 10, 2025, inclusive, and who were damaged thereby. Excluding from the Class are Defendants, the officers, and directors of the Company, at all relevant times, members of their immediate families and their

32

legal representatives, heirs, successors, or assigns, and any entity in which the Defendants have or had a controlling interest.

78. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, CHOW's shares actively traded on the NYSE American. While the exact number of Class Members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of CHOW shares were traded publicly during the Class Period on the NYSE American. Record owners and other members of the Class may be identified from records maintained by CHOW or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

79. Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

80. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

81. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    a. whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.      whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of CHOW; and

c.      to what extent the members of the Class have sustained damages and the proper measure of damages.

82.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VII.    UNDISCLOSED ADVERSE FACTS

83.    The market for CHOW securities was open, well-developed, and efficient at all relevant times. As a result of these materially false and misleading statements and/or failures to disclose, CHOW securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired CHOW securities relying upon the integrity of the market price of the Company's securities and market information relating to CHOW and have been damaged thereby.

84.    Throughout the Class Period, Defendants materially misled the investing public thereby inflating the price of CHOW securities, by publicly issuing false and/or misleading statements and/or omitting to disclose the material facts necessary to make Defendants' statements, as set forth herein, not false or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose adverse material information and/or misrepresented the truth about CHOW's business, operations, and prospects as alleged herein.

34

85.    At all relevant times, the material misrepresentations and omissions particularized in the Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about CHOW's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company, its financial well-being, and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements and omissions during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## VIII.    LOSS CAUSATION

86.    Defendants' wrongful conduct, as alleged herein, directly, and proximately caused the economic loss suffered by Plaintiff and the Class.

87.    During the Class Period, Plaintiff and the Class purchased CHOW's securities at artificially inflated prices and were damaged thereby. The price of CHOW's securities significantly declined when the misrepresentations made to the market, and/or the information alleged to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## IX.    SCIENTER ALLEGATIONS

88.    As alleged herein, Defendants acted with scienter because Defendants: (1) knew that the public documents and statements issued or disseminated in the name of CHOW were materially false and/or misleading; (2) knew that such statements or documents would be issued or disseminated to the investing public; and (3) knowingly and substantially participated or

35

acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding CHOW, their control over, and/or receipt and/or modification of CHOW's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

## X.    APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

89.    The market for CHOW's securities was open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, CHOW's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of CHOW's securities and market information relating to the Company, and have been damaged thereby.

90.    During the Class Period, the artificial inflation of CHOW's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about CHOW's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of CHOW and its business, operations, and prospects, thus causing the price of CHOW's securities to be artificially inflated at all relevant times, and, when disclosed, negatively affected the value of the Company's shares. Defendants' materially false and/or misleading statements and/or omissions during the Class

36

Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, and each of them has been damaged as a result.

91.    At all relevant times, the market for CHOW securities was an efficient market for the following reasons, among others:

    a.    CHOW shares met the requirements for listing and were listed and actively traded on the NYSE American, a highly efficient and automated market; and/or

    b.    CHOW communicated with public investors through established market communication mechanisms, including through dissemination of press releases on national circuits of major newswire services and through other public disclosures.

92.    As a result of the foregoing, the market for CHOW securities promptly digested current information regarding CHOW from all publicly available sources and reflected such information in CHOW's share price. Under these circumstances, all purchasers of the Company's securities during the Class Period suffered similar injury through their purchase of CHOW's securities at artificially inflated prices and a presumption of reliance applies.

93.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable

investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XI.    NO SAFE HARBOR

94.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in purportedly forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of CHOW who knew that the statement was false when made.

### FIRST CLAIM

**Violation of Section 10(b) of The Exchange Act and Rule 10b-5
Promulgated Thereunder Against All Defendants**

95.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

96.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase CHOW securities at artificially inflated prices. In

furtherance of this unlawful scheme, plan and course of conduct, Defendants and each defendant, took the actions set forth herein.

97. Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for CHOW securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

98. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about CHOW's financial well-being and prospects, as specified herein.

99. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices and a course of conduct as alleged herein in an effort to assure investors of CHOW's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of materials facts and/or omitting to state material facts necessary in order to make the statements made about the Company and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

100.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections, internal controls and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of, and had access to, other members of the Company's management team, internal reports, and other data information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

101.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing CHOW's true financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' misstatements and/or omissions regarding the Company's business, operations, financial well-being and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

102.   As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, set forth above, the market price of CHOW securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and other members of the Class acquired CHOW securities during the Class Period at artificially inflated prices and were damaged thereby.

103.   At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that CHOW was experiencing, which was not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their CHOW securities, or, if they had acquired such securities during the Class Period, they would not have done so at artificially inflated prices.

104.   By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

105.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

**Violation of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

106.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

107.    Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

108.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercise the same.

109.    As set forth above, CHOW and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other

42

members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XII.    PRAYER FOR RELIEF

110.    WHEREFORE, Plaintiff prays for relief and judgment, as follows:

a.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

b.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

111.    Plaintiff hereby demands a trial by jury.

Dated: March 13, 2026

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

/s/ Matthew M. Guiney
Matthew M. Guiney
Patrick Donovan
270 Madison Avenue
New York, NY 10016
Tel: (212) 545-4600
Fax: (212) 686-0114
guiney@whafh.com
donovan@whafh.com

43

## PLAINTIFF'S CERTIFICATION

**Nisha Hansink** ("Plaintiff") declares under penalty of perjury, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed the complaint and authorized the commencement of a federal securities class action on Plaintiff's behalf.

2.    Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and tri al, if necessary.

4.    Plaintiff's transactions in **ChowChow Cloud International Holdings Limited** during the Class Period specified in the Complaint are as follows:

### SEE ATTACHED SCHEDULE A

5.    During the three years prior to the date of this Certificate, Plaintiff has not sought to serve nor served as a representative party for a class in an action filed under the federal securities laws.

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed 3/5/2026

_____.

Ondertekend door:

8B417D09D48F48A...

**Nisha Hansink**

Docusign Envelope ID: 583091Z5-4CF4-43C1-AF35-24FD1DB1801B

**Schedule A to Certification of Nisha Hansink**
**ChowChow Cloud International Holdings Limited**

**Purchases**

| Date | Number of Shares | Price per Share |
|------|------------------|-----------------|
| 12/08/25 | 12 | $11.04 |
| 12/08/25 | 195 | $9.97 |
| 12/08/25 | 3,600 | $9.60 |
| 12/08/25 | 100 | $9.60 |
| 12/08/25 | 100 | $9.60 |
| 12/08/25 | 710 | $9.60 |
| 12/08/25 | 16 | $11.25 |
| 12/09/25 | 460 | $11.20 |

**Sales**

| Date | Number of Shares | Price per Share |
|------|------------------|-----------------|
| 12/10/25 | 257 | $1.87 |
| 12/10/25 | 1000 | $2.05 |
| 12/10/25 | 1000 | $2.17 |
| 12/10/25 | 1000 | $3.00 |
| 12/10/25 | 1000 | $2.50 |
| 12/10/25 | 10 | $2.13 |