**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

TALLULAH KELLY, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

CHOWCHOW CLOUD INTERNATIONAL HOLDINGS LIMITED, YEE KAR WING, HUI WAI MING, WONG CHUNG WAI, SHI CHEUK KWAN, TSANG CHI HON, WONG KA LUN, US TIGER SECURITIES, INC., TIGER FINTECH HOLDINGS, INC., UP FINTECH GLOBAL HOLDINGS, LTD., UP FINTECH HOLDING, LTD., COGENCY GLOBAL INC., COLLEEN A. DE VRIES, and ASSENTSURE PAC,

Defendants.

Case No: 1:26-cv-02063-VEC

**CLASS ACTION**

**DEMAND FOR JURY TRIAL**

**AMENDED COMPLAINT**
**FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Lead Plaintiff Tallulah Kelly ("Lead Plaintiff"), individually and on behalf of all others similarly situated (the "Class"), by and through her attorneys, alleges the following upon information and belief, except as to those allegations concerning Lead Plaintiff, which are alleged upon personal knowledge. Lead Plaintiff's information and belief is based upon, among other things, her counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by ChowChow Cloud International Holdings Limited ("CHOW" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by CHOW; and (c) review of other publicly available information concerning CHOW and similar entities.

## I. NATURE OF THE ACTION AND OVERVIEW

1. This is a class action on behalf of persons and entities that purchased or otherwise acquired CHOW securities (i) pursuant or traceable to the Company's initial public offering ("IPO" or the "Offering") on or around September 16, 2025, and (ii) between September 16, 2025, and December 10, 2025, inclusive (the "Class Period"). Lead Plaintiff pursues claims against CHOW; Yee Kar Wing; Hui Wai Ming; Wong Chung Wai; Shi Cheuk Kwan; Tsang Chu Hon; Wong Ka Lun; US Tiger Securities, Inc.; Tiger Fintech Holdings, Inc.; Up Fintech Global Holdings, Ltd.; Up Fintech Holding, Ltd.; Cogency Global Inc.; Colleen A. De Vries; and Assentsure PAC (the "Defendants"), under the Securities Act of 1933 (the "Securities Act") and/or the Securities Exchange Act of 1934 (the "Exchange Act").

2. The Company is a holding company incorporated in the Cayman Islands with purported operations centralized in the Asia-Pacific region, primarily in Hong Kong and Singapore, conducted by its indirect wholly owned subsidiary, Sereno Cloud Solutions HK Limited ("Sereno") in Hong Kong, a special administrative region of the People's Republic of China. The Company is purportedly a pioneer in providing one-stop cloud solutions that support

companies across the IT industry value chain throughout their entire cloud transformation journey from consulting, deployment, and migration to cloud environmental building and management. The Company's business purportedly comprises: (i) digital transformation consulting services consisting primarily of cloud suitability assessment, real-time resource management, and strategic planning and advisory; (ii) professional IT services comprising a wide range of capabilities designed to facilitate seamless cloud integration and digital transformation; (iii) AI-powered proactive cloud managed services covering all aspects of day-to-day cloud maintenance and support; and (iv) IT infrastructure solutions covering on-premise private cloud setups and public cloud integrations including infrastructure applications such as the Company's Sereno Cloud App360 AI and Data Science Platform, which consists of several core components.

3. During the Class Period, CHOW's principal executive offices were located at Unit 03, 23/F, Aitken Vanson Centre, No. 61 Hoi Yuen Road, Kwun Tong, Kowloon, Hong Kong. The Company completed its IPO on or around September 16, 2025, selling 2.6M ordinary shares at an offering price of $4.00 per share, raising $10.4M in gross proceeds.

4. This case arises from the sudden collapse of CHOW's stock price on December 10, 2025, including multiple halts of trading by the New York Stock Exchange American Exchange (the "NYSE American") in the Company's securities due to volatility from market manipulation that caused the Company's stock price to surge following the IPO despite no fundamental change in profile, news, or information from or regarding the Company. On that date, trading in the Company's stock was halted twice and its price collapsed 84.3% from a closing price of $11.70 per share on December 9, 2025, down to $1.83 per share at closing on December 10, 2025. Investigation and public reports have revealed that CHOW was a vehicle utilized in a market manipulation and "pump-and-dump" promotional scheme. As part of the scheme, impersonators

acting as financial advisors touted CHOW in online forums, chat groups, and social media posts with baseless claims to create a buying frenzy amongst retail investors.

5. Throughout the Class Period and in the Offering Documents (defined below), Defendants made materially false and/or misleading statements and failed to disclose material adverse facts about the Company's business, operations, and the true nature of the trading activity in the securities. Specifically, Defendants failed to disclose to investors that: (1) CHOW was the subject of a market manipulation and fraudulent promotion scheme involving social-media based misinformation and impersonators posing as financial professionals; (2) CHOW's public statements and risk disclosures omitted any mention of the risk of fraudulent trading or market manipulation used to drive the Company's stock price; (3) which, as a result, put CHOW securities at unique risk of a halt in trading by NYSE American and severe volatility-induced decline, resulting in heavy investor losses; (4) the sole underwriter for the IPO, Tiger Securities, had been fined and censured by the Financial Industry Regulatory Authority ("FINRA") in April 2025, just months before the IPO, for failing to have a reasonable system in place to identify potentially suspicious deposits of low-priced securities and was connected to a number of similar foreign microcap companies whose stock price collapsed due to market manipulation; (5) the Company's statements significantly overstated the legitimacy of the Company's operations and customer base; and, (6) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

6. Defendants were negligent in preparing the Registration Statement and in conducting due diligence in connection with the IPO. Defendants failed to conduct a reasonable investigation and lacked reasonable grounds to believe that the Registration Statement was accurate and complete. The Underwriter Defendants (defined below) had access to non-public

information, including account-opening records, allocation data, and trading information reflecting suspicious and coordinated patterns. Despite these red flags, Defendants conducted only cursory due diligence and failed to disclose the material facts described herein. The Registration Statement failed to disclose that the Defendants had failed to conduct a reasonable investigation. By issuing and disseminating the Registration Statement, Defendants violated the Securities Act.

7. In addition, Defendants made materially false and misleading statements in the Registration Statement and the Underwriting Agreement (defined below) by representing that the Registration Statement complied with the Securities Act and contained no untrue statements of material fact and omitted no material facts necessary to make the statements therein not misleading.

8. Further, Defendants also violated Item 303 of Regulation S-K by failing to disclose known material trends and uncertainties. Specifically, Defendants failed to disclose that the Offering was highly susceptible to "pump-and-dump" schemes and that the Underwriter Defendants' systemic deficiencies in anti-money laundering ("AML") compliance, supervision, and business communication monitoring created a substantial likelihood of adverse effects on the Company's financial condition and operations, including post-IPO price collapses, loss of investor confidence, regulatory scrutiny, and potential trading suspensions.

9. In addition, Defendants violated Item 105 of Regulation S-K by failing to adequately disclose, in plain English, the specific material risk factors that made an investment in the Offering speculative and risky. These omitted risks included the likelihood of coordinated social media-driven "pump-and-dump" schemes and the Underwriter Defendants' systemic failures in AML programs, supervisory systems, and business-communication monitoring.

## II. JURISDICTION AND VENUE

10. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5), and Sections 11, 12(a)(2) and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l(a)(2), and 77o).

11. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa), and Section 22 of the Securities Act (15 U.S.C. § 77v).

12. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) and Section 22 of the Securities Act (15 U.S.C. § 77v). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part, in this Judicial District. In addition, the Company's agent for service of process, Defendants Cogency and Tiger Securities (defined below) are located in this Judicial District. Cogency has offices located at 122 East 42nd Street, 18th Floor, New York, NY 10168. Tiger Securities has offices located at 437 Madison Avenue, 27th Floor, New York, NY 10022.

13. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and/or indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

14. Lead Plaintiff Tallulah Kelly purchased CHOW securities during the Class Period, pursuant or traceable to the Company's IPO, and suffered substantial damages as a result of the

federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

15. Defendant CHOW is a Cayman Islands incorporated holding company with principal executive offices in Hong Kong. The Company's common stock traded on the NYSE American under the symbol "CHOW" during the Class Period.

16. Defendant Yee Kar Wing ("Wing") is and was the Company's Chief Executive Officer and Chairman of the Board of Directors at all relevant times. Defendant Wing was a signatory on the Registration Statement.

17. Defendant Hui Wai Ming ("Ming") was the Company's Chief Operating Officer at all relevant times.

18. Defendant Wong Chung Wai ("Wai") was the Company's Chief Financial Officer at all relevant times. Defendant Wai was a signatory on the Registration Statement.

19. Defendant Shi Cheuk Kwan ("Kwan") was a member of the Board of Directors and signatory on the Registration Statement.

20. Defendant Tsang Chi Hon ("Hon") was a member of the Board of Directors and signatory on the Registration Statement.

21. Defendant Wong Ka Lun ("Lun") was a member of the Board of Directors and a signatory on the Registration Statement.

22. Defendant Assentsure PAC ("Assentsure" or the "Auditor Defendant") has served as the Company's auditor since 2023.

23. Defendant US Tiger Securities Inc. ("Tiger Securities") served as the Company's underwriter in connection with its IPO. Tiger Securities is headquartered within this District. On April 25, 2025, Tiger Securities, along with its securities broker affiliate TradeUP Securities Inc.,

was censured and fined by FINRA for failing to maintain proper AML programs designed to detect and report potentially suspicious activity and transactions in thinly traded low-priced securities. Tiger Securities is headquartered within this District and is a wholly owned (100%) subsidiary of Defendants Tiger Holdings, Up Fintech Global, and Up Fintech.

24. Defendant Tiger Fintech Holdings, Inc. ("Tiger Holdings") is the 100% owner and parent company of Defendant Tiger Securities. Tiger Holdings is incorporated in the State of Delaware and is a wholly owned subsidiary (100%) of Defendants Up Fintech Global and Up Fintech.

25. Defendant Up Fintech Global Holdings, Ltd. ("Up Fintech Global") is the 100% owner and parent company of Defendants Tiger Holdings and Tiger Securities. Up Fintech Global is incorporated in the British Virgin Islands ("BVI") and is a wholly owned subsidiary (100%) of Defendant Up Fintech.

26. Defendant Up Fintech Holding, Ltd. ("Up Fintech") is a Cayman Islands incorporated holding company that is the 100% owner and parent company of Defendants Up Fintech Global, Tiger Holdings, and Tiger Securities. Up Fintech is headquartered in Singapore, with offices and operations in Australia, China, as well as this District. Up Fintech's common stock is listed on NASDAQ, trading under the symbol "TIGR."

27. Defendant Cogency Global, Inc. ("Cogency") was the Company's agent and authorized United States representative at all relevant times and is headquartered in this District.

28. Defendant Colleen A. De Vries ("De Vries") was the Company's authorized representative in the United States and a Senior Vice President of Defendant Cogency. De Vries signed the Registration Statement on September 16, 2025, approving it for issuance.

29. Defendants Wing, Ming, Wai, Kwan, Hon, and Lun (collectively, the "Individual Defendants"), because of their positions within the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to the market. The Individual Defendants were provided with copies of the Company's public filings, reports, and press releases alleged herein to be materially misleading prior to, or shortly after, their issuance and had the ability, opportunity, and obligation to prevent their issuance or promptly correct them. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

30. The Auditor Defendant issued a clean audit opinion on the Company's financial statements incorporated into the Registration Statement issued in connection with the Company's September 16, 2025, IPO. Additionally, Defendant Assentsure was CHOW's auditor throughout and for years prior to the Class Period and had access to material non-public information. Because of its position, Assentsure knew or should have known that the adverse facts alleged herein had not been disclosed to and were being concealed from the investing public and that the positive representations being made were materially false and/or misleading. Furthermore, due to its position, Assentsure had the ability and opportunity to prevent issuance of fraudulent SEC filings and/or cause them to be corrected. Therefore, the Auditor Defendant is also liable for the materially false and misleading statements and omissions pleaded herein.

31. Defendant Tiger Securities and by extension Tiger Holdings, Up Fintech Global, and Up Fintech, as its parents (collectively the "Underwriter Defendants"), were the sole

underwriter on the IPO as identified at numerous points throughout the Prospectus (defined below) and the sole representative underwriter and signatory on the underwriting agreement between the Company and the underwriters (the "Underwriting Agreement"), and agreed to conduct the IPO on a firm commitment basis. The Underwriter Defendants, based on their position, had the ability and opportunity to prevent the issuance of false and misleading SEC filings and/or cause them to be corrected. With this authority and by acting as sole book-runner and representative for the underwriters, Lead Plaintiff and the Class could and did reasonably attribute the materially misleading false statements and omissions contained in the Registration Statement (defined below) to the Underwriter Defendants and accordingly, the Underwriter Defendants are also liable for the false statements and omissions pleaded herein.

32. Tiger Securities and as a result, the Underwriter Defendants as a whole by nature of their relationship, served as underwriter and/or sole book-runner in other recent IPOs of similar foreign, microcap companies that have experienced extreme trading volume and price volatility resulting in significant investor losses including, but not limited to: J-Long Holding Limited ("J-Long"); Oriental Rise Holding Ltd. ("ORIS"); DarkIris Inc. ("DarkIris"); and Smart Digital Group Limited ("SDM"). On or around January 24, 2024, J-Long conducted its initial public offering at an offering price $5.00 per share. Within a week of trading, J-Long's stock price closed at $14.30 per share and continued upward, hitting a peak closing price of $19.69 per share on February 23, 2024, and an intraday spike to $29.95 per share on February 27, 2024. Then, J-Long's stock price suddenly declined to $12.80 per share on February 28, 2024, on daily trading volume of over 500,000 (more than double the previous high) and then fully collapsed to close at $2.00 per share on February 29, 2024, on volume exceeding 17.6 million. If J-Long had not undergone a 10-for-1 stock split, the current trading price would be approximately $0.48 per share. On October 17, 2024,

ORIS conducted its initial public offering at an offering price of $4.00 per share and within a single trading day, the stock price surged to $155.00 per share. ORIS then reached a share price high of $424.80 per share and a $1.2 billion market capitalization at closing on December 5, 2024, before suffering an 82.66% decline to close at $73.67 per share on then-record trading volume on December 6, 2024. Even following a 20-to-1 reverse stock split in December 2025, ORIS now trades well below $1.00 per share, has a market capitalization of $2.6 million, and on April 20, 2026, was notified that NASDAQ intends to delist ORIS ordinary shares. Further, on September 30, 2025, DarkIris was halted from trading by the NASDAQ and its stock declined from $10.43 per share at open down to $1.29 per share at closing on September 30, 2025. Lastly, on May 5, 2025, SDM conducted its initial public offering with an offering price of $4.00 per share and following the offering, SDM stock exhibited heavy trading volume and extreme price run-ups, including reaching as high as $29.40 per share on July 28, 2025, before being halted by NASDAQ on September 26, 2025, and suffering an 86.4% decline down to $1.85 per share that same day. SDM was later suspended from trading by the SEC for a period of two weeks based on suspected market manipulation and with the expiration of the SEC trading suspension, NASDAQ halted trading pending an information request. SDM stock remained halted from trading until NASDAQ delisted the stock on July 13, 2026.

33. Furthermore, on April 25, 2025, Tiger Securities, along with its securities broker affiliate TradeUP Securities Inc., was censured and fined by FINRA for failing to maintain proper AML programs designed to detect and report potentially suspicious activity and transactions in thinly traded low-priced securities. Then, on May 22, 2026, *Reuters* reported that China announced a major crackdown on cross-border investment, its intention to punish brokers accused of "illegally moving money to foreign markets, sending their shares plunging[,]" naming UP Fintech

subsidiaries and causing a substantial decline in the price of UP Fintech securities. On June 2, 2026, *Reuters* reported that an UP Fintech subsidiary, Tiger Brokers, announced that as of June 12, 2026, it will bar China-based investors from adding to their positions when they are physically located in mainland China.

34. Defendants Cogency and De Vries (the "Agent Defendants") were the Company's agents for service of process in the United States, as required by 17 CFR § 249.250 of the Exchange Act. Through their roles, the Agent Defendants had the ability and opportunity to prevent issuance of the false and misleading Registration Statement and Prospectus, and/or cause them to be corrected. Therefore, they are also liable for the false statements pled herein.

## IV. SUBSTANTIVE ALLEGATIONS

### A. Regulatory Response to Market Manipulation in Hong Kong

35. In 2021, the Hong Kong Securities and Futures Commission ("HK SFC") recognized the development and proliferation of market manipulation on the Hong Kong Securities Exchange and began work to address the issue. Between 2021 and 2025, the HK SFC stifled the regional operating framework for the syndicates behind ramp-and-dump and pump-and-dump schemes of local exchanges by freezing hundreds of millions in client assets, seeking and enforcing multi-year prison sentences, and coordinating with local authorities.

36. For instance, Wan Cheng Metal Packaging Company Limited was manipulated by a highly organized syndicate. Forensic tracking was utilized to uncover accounts belonging to or associated with corporate insiders that were coordinated to inflate stock trading volume and price over a four-month period. When the share price was sufficiently "ramped," the syndicate used social media to create a retail buying base to drive or "pump" the stock price up further. Then, syndicate members "dumped" shares. In January 2026, the HK SFC obtained an injunction from

the Hong Kong Court of First Instance freezing HK$85.2 million in assets, and four of the individuals from the syndicate are facing formal criminal charges

37. In another example, KNT Holdings Limited's insiders colluded by shifting highly concentrated pre-IPO share blocks into nominee trading accounts and worked together with syndicate members, who weaponized social media platforms to drive a retail investor base. Retail investors were fed fake tips regarding acquisitions and business expansion, and this permitted insiders to capitalize on the artificial inflation to then unload their holdings. When this was uncovered, a total of eighteen defendants were criminally charged with conspiracy to defraud, market manipulation, and money laundering. Trial dates in this matter were set on March 25, 2025, months before the CHOW IPO. On March 25, 2026, the HK SFC announced that it obtained a court order freezing assets worth up $219 million belonging to suspected manipulators.

38. Trial dates in the matter of Fullwealth Construction Holdings Company Limited were set on March 25, 2025. There, corporate blockholders and third-party money managers coordinated an off-market liquidity ring, which was executed, not through the standard selling of shares, but rather massive blocks that were routed to localized nominees to prevent early price disruption. Social media platforms were used to create a retail buying base that permitted insiders to sell their stock at inflated levels. Following its investigation, HK SFC froze the broker accounts, which held illicit gains.

39. Trial dates concerning Eggriculture Foods Limited were also set on March 25, 2025. In this instance, a syndicate secured control of a vast majority of the company's public float through relationships with early-stage investors then used fraudulent social media groups to convince investors that institutional investors were moving into the stock. As retail investors purchased the stock, the syndicate executed a multi-broker dump of their shares. On December 2,

2025, the HK SFC announced that it had obtained a court order to freeze up to $62.6 million of assets of the suspected manipulators.

40. These companies share a number of traits similar to CHOW: (i) a high concentration of shares held by insiders and affiliates; (ii) social media campaigns soliciting outside investors; and (iii) a steady climb on minimal volume followed by an outsized increase in volume, eventually concluding in a dump of shares and outsized decline in share price.

41. Faced with heightening regulatory scrutiny and with the lure of greater capital, these schemes moved their operations to U.S.-based exchanges. Under then-existing U.S. listing standards, tiny, foreign shell companies and/or highly concentrated, foreign micro-cap stocks could easily list in the U.S. by raising minimal public capital, as low as $5 million. Indeed, nearly 74 foreign, microcap IPOs were conducted in 2024 and 111 in 2025 with nearly 100 originating from the Asia-Pacific region.

42. However, as early as November 2022, FINRA was warning of a "heightened threat of fraud" in "small-capitalization IPOs," with "primary operations in China" like CHOW.[1] As gatekeepers to U.S. markets, the Underwriter Defendants were duty-bound to keep abreast of these updates as part of their due diligence and "pay close attention to suspicious trends in the marketplace and how they may affect members' obligations" as well as "continuously evaluate and adapt their supervisory systems as well as compliance and risk management programs to ensure that they are monitoring for and addressing this threat."[2] Failure to do so "subjects underwriters to potential liability under Sections 11 and 12 of the Securities Act of 1933, providing

[1]FINRA, *Heightened Threat of Fraud: FINRA Alerts Firms to Recent Trend in Small Capitalization IPOs*, (Nov. 17, 2022), https://www.finra.org/rules-guidance/notices/22-25

[2] *Id*.

a strong incentive for underwriters to help ensure the accuracy of disclosures in registration statements."[3]

43. FINRA's November 2022 notice goes on to detail "the following elements" as clear "red flags" to alert underwriters of a foreign micro-cap IPO "ramp-and-dump" scam:[4]

> • ***Small Market Capitalization and Limited Public Float*** *– Each IPO typically raised less than $25 million and valued each issuer at less than $100 million, with the IPO typically issuing fewer than 20 million shares.*
>
> • ***Foreign Issuers*** *– Many issuers or their operating subsidiaries or affiliates maintained primary operations in China, but some issuers also based their operations in other countries.*
>
> • ***Foreign Broker-Dealers*** *– Foreign broker-dealers, primarily based in Hong Kong, have allocated or been allocated significant amounts of the shares, sometimes as much as 90 percent or more of the shares. The practice of allocating a majority of the shares issued in an IPO to foreign broker-dealers may limit the supply of the public float available to the market on the day of the IPO and during the price increase phase of ramp-and-dump schemes.*
>
> • ***Concentrated Allocations of IPO Shares*** *– Underwriters and selling group members (including foreign broker-dealers) may be allocating the majority of shares to a small number of investors, leading to a concentration of shares being held in very few hands.*
>
> • ***Nominee Accounts*** *– Nominee accounts, primarily accounts opened for foreign nationals, have been opened at U.S. broker-dealers to invest in IPOs and later place manipulative orders and trades to inflate aftermarket prices. These accounts raise potential concerns, including:*
>
> *account holders' possible lack of awareness that their identities were being used to open the accounts;*

---

[3] *Id*. (citing SEC Release on Proposed Rules for Special Purpose Acquisition Companies, Shell Companies, and Projections, Release Nos., 33-11048, 34-94546, IC-34549, File No. S7-13-22 (March 30, 2022)).

[4] *Id*.

*apparent contradictions between customers' trading activity and their ages, occupations, investment experience, financial status and sources of funding;*

*indicators that funding for initial IPO customer accounts are being financed, directly or indirectly, by the issuer or other third parties, including through potential loans; and*

*possible centralized control over a group of nominee accounts, which can be identified through indicators such as:*

*similar timing of account opening;*

*similar referral source or point of contact for accounts;*

*similar customer contact information;*

*similar bank account information;*

*similar IP addresses;*

*similar initial account funding amounts;*

*similar amounts of indications of interest for IPOs; and*

*multiple customers or accounts placing layered buy limit orders at or around the same time, at prices higher than the IPO price, and frequently in odd-lot amounts or other "red flags" of pre-arranged or coordinated trading.*

- ***Foreign Omnibus Accounts*** *– Omnibus accounts at U.S. broker-dealers maintained for foreign financial institutions, including foreign broker-dealers, have been observed liquidating large amounts of shares of the small-cap issuers at the peak of price spikes associated with suspected ramp-and-dump schemes. In some cases, the accounts in question did not trade the securities at all until significant price increases occurred and appeared to time their sales for when the stock price peaked.*

- ***Significant Price Spikes and Drops*** *– Most shares of issuers that are the subject of suspected ramp-and-dump schemes experienced significant price increases in the opening trade on an exchange and in continuous trading on the day of, or days immediately following, the listing. These price increases did not appear to be driven by news or material events. After the spike, the price quickly declined to a level at or below the offering price.*

> • ***Allegations of Social Media Scams*** *– Investors in securities that are the subject of suspected ramp-and-dump schemes (including investors in the IPOs) have complained about investing in a ramp-and-dump scheme through so-called "pig butchering." These schemes sometimes begin with a seemingly misdirected text message or message on a social media messaging application leading to a relationship (sometimes romantic in nature) between victims and bad actors. After a relationship is established, the bad actor will make a recommendation to the victim to place limit orders in certain securities at a specific time and price.*

Importantly, FINRA notes this list is not exclusive or exhaustive. Specifically, FINRA warns that "the schemes are evolving, and members should pay close attention to suspicious trends in the marketplace and how they may affect members' obligations. FINRA encourages members to continuously evaluate and adapt their supervisory systems as well as compliance and risk management programs to ensure that they are monitoring for and addressing this threat."[5]

44. For response procedures, FINRA goes on to detail exactly what underwriters of securities should implement to maintain compliance in the face of these social media based "ramp-and-dump" or pump-and-dump schemes:[6]

> *In the context of ramp-and-dump schemes, moreover, members should consider their obligations under the Bank Secrecy Act (BSA), its implementing regulations and FINRA Rule 3310 (Anti-Money Laundering Compliance Program), including to:*
>
> - *maintain customer identification programs to verify the identity of each customer;*[7]
> - *verify the identity of the beneficial owners of legal entity customers;*[8]

[5] *Id.*

[6] *Id.*

[7] *See* FINRA Rule 3310(b) and 31 C.F.R. § 1023.220.

[8] *See* FINRA Rule 3310(f)(ii) and 31 C.F.R. §1010.230.

- *establish due diligence programs for correspondent accounts for foreign financial institutions, including omnibus accounts held for foreign financial institutions;*[9]

- *establish and implement policies and procedures that can be reasonably expected to detect and cause the reporting of suspicious transactions conducted or attempted by, at, or through U.S. broker-dealers to the U.S. Treasury Department's Financial Crimes Enforcement Network (FinCEN);*[10] *and*

- *implement appropriate risk-based procedures for conducting ongoing customer due diligence, including to understand the nature and purpose of customer relationships for the purpose of developing a customer risk profile, and to conduct ongoing monitoring to identify and report suspicious transactions.*[11]

Upon detection of red flags related to ramp-and-dump schemes through monitoring, members should consider whether additional investigation, customer due diligence measures or a Suspicious Activity Report (SAR) filing may be warranted. Members also should consider whether, depending on the facts and circumstances, other obligations may be implicated, including, but not limited to the following

- *Exchange Act Rule 10b-5; Securities Act, Section 17(a); and FINRA Rule 2020 (Use of Manipulative, Deceptive or Other Fraudulent Devices);*

- *FINRA Rule 2010 (Standards of Commercial Honor and Principles of Trade);*

- *FINRA Rule 2090 (Know Your Customer);*

- *FINRA Rule 3110 (Supervision);*

- *FINRA Rule 4512 (Customer Account Information);*

---

[9] *See* FINRA Rule 3310(b) and 31 C.F.R. § 1010.610; *c.f.* SEC Staff Bulletin: Risks Associated with Omnibus Accounts Transacting in Low-Priced Securities, https://www.sec.gov/tm/risks-omnibus-accounts-transacting-low-priced-securities.

[10] *See* FINRA Rule 3310(a) and 31 C.F.R. § 1023.320.

[11] *See* FINRA Rule 3310(f) and 31 C.F.R. § 1023.210(a)(5).

- *FINRA Rule 5130 (Restrictions on the Purchase and Sale of Initial Equity Public Offerings);*
- *FINRA Rule 5131 (New Issue Allocations and Distributions);*
- *SEC Regulation M;*
- *SEC Market Access Rule, Securities Exchange Act Rule 15c3-5; and*
- *SEC Identity Theft Red Flags Rule, Regulation S-ID.*

45. Furthermore, on May 28, 2025, the U.S. Department of Justice announced that it had successfully obtained forfeiture of approximately $214 million in proceeds from the "pump-and-dump" scheme that resulted in charges against seven individuals.[12] According to the release, from November 2024 through February 2025, there was misleading promotion and coordinated trading in shares of China Liberal Education Holdings, Ltd., which caused the stock price to artificially rise, at which point members of the conspiracy sold thousands of shares and made millions of dollars in profits. As a result of the investigation, federal law enforcement was able to seize approximately $214 million proceeds.

**B. Material Misstatements and Omissions Contained in CHOW's Registration Statement and Prospectus**

46. The Class Period begins on September 16, 2025, when the Company conducted its IPO and filed its Prospectus permitting the Company to issue 2.6 million ordinary shares at an initial offering price of $4.00 per share for a total capital raise of $10.4M (the "Prospectus"). In the Prospectus, which formed part of the registration statement filed in connection with the IPO (the "Registration Statement"), the Company provided the following overview of its business:

---

[12] The indictment was filed on March 20, 2025. *See U.S. v. Cedric*, No. 1:25-cr-00161 (N.D. Ill.) (https://www.justice.gov/usao-ndil/media/1394106/dl?inline).

> We are a pioneer in providing one-stop cloud solutions that support companies across the IT industry value chain throughout their entire cloud transformation journey from consulting, deployment and migration to cloud environment building and management. We were founded in December 2014 by a group of passionate and experienced professionals, who envisioned the potential of cloud technology to transform the way businesses of various sizes operate. Recognizing the growing need for digitization and the benefits that cloud technology could bring to businesses, our founders set out to create a company that would bridge the gap between cloud services providers and companies who seek to move to the cloud.
>
> Our business primarily comprises (i) digital transformation consulting services consisting primarily of cloud suitability assessment, real-time resource management and strategic planning and advisory, (ii) professional IT services comprising a wide range of capabilities designed to facilitate seamless cloud integration and digital transformation, (iii) AI-powered proactive cloud managed services covering all aspects of day-to-day cloud maintenance and support, and (iv) IT infrastructure solutions covering on-premise private cloud setups and public cloud integrations, leveraging (including) our Sereno Cloud App360 AI and Data Science Platform (the "AI & Data Science Platform").
>
> We have experienced a substantial growth in financial performance recently. Our revenue increased by 28.6% from HK$141.4 million in 2023 to HK$181.8 million (US$23.3 million) in 2024.

47. The Prospectus also contained financial results for fiscal year 2023 and 2024, as well as the Report of Independent Registered Public Accounting Firm signed by Defendant Assentsure regarding those financial results. Specifically, Defendant Assentsure reported the following:

> **Opinion on the Financial Statements**
> We have audited the accompanying consolidated balance sheets of ChowChow Cloud International Holdings Limited and its subsidiaries (collectively, the "Company") as of December 31, 2024 and 2023, the related consolidated statements of operations and comprehensive income, changes in equity and cash flows for the years ended December 31, 2024 and 2023 and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial positions of the Company as of

December 31, 2024 and 2023 and the results of its operations and its cash flows for the years ended December 31, 2024 and 2023, in conformity with accounting principles generally accepted in the United States of America.

**Basis for Opinion**

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits, we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/Assentsure PAC

We have served as the Company's auditor since 2024.

Singapore
May 28, 2025
PCAOB ID Number: 6783

48. The Prospectus also provided information regarding the Company's purported "Competitive Strengths[,]" which included the following:

> We believe that the following competitive strengths have contributed to our success and differentiated us from our competitors:
>
> - dual capabilities in cloud services and IT services;
> - strong geographic presence and local expertise in Asia-Pacific;
> - established partnerships with major cloud and technology service providers;
> - diverse and extensive customer base; and
> - agility and responsiveness to market and technology changes.

49. The Prospectus also addressed the Company's purported "Growth Strategies[,]" stating as follows:

> We intend to develop our business and strengthen brand loyalty by implementing the following strategies:
>
> - expand our footprints in the Asia-Pacific region and globally;
> - growth through strategic acquisitions;
> - enhance our service capabilities and expand our service offerings;
> - maintain strong relationships with existing partners and establish new collaborations; and
> - invest in and continue to adopt cutting-edge cloud technology and AI.

50. The Company discussed the risks associated with "hav[ing] a substantial customer concentration, with a limited number of customers accounting for a substantial portion of our revenues." The Prospectus identified the Company's:

> [T]op three customers in the fiscal years ended December 31, 2023 and 2024 accounted for approximately 62.2% and 38.2% of our total revenue, respectively. Specifically, Motto Group Limited, Service Sky Limited and Asia Top Loyalty Limited, our top three customers in the fiscal year ended December 31, 2023, contributed approximately 32.8%, 17.9% and 11.5% of our total revenue, respectively, while Conversant Technologies Ple. Ltd., Motto Group Limited and Star-tech Computing Limited, our top three customers in the fiscal year ended December 31, 2024, contributed approximately 16.4%, 12.1% and 9.7% of our total revenue, respectively.

The Prospectus further stated that:

> Inherent risks exist whenever a large percentage of total revenues are concentrated with a limited number of customers. It is not possible for us to predict the future level of demand for our solutions and services that will be generated by these customers or the future demand for our solutions and services by these customers in the marketplace. If any of these customers experience declining or delayed sales due to market, economic or competitive conditions, we could be pressured to reduce our prices or they could decrease the purchase quantity of our solutions and services, which could have an adverse effect on our margins and financial position, and could negatively affect our revenues and results of operations. If any of our largest customers terminates the purchase of our solutions and services, such termination would materially negatively affect our revenues, results of operations and financial condition.
>
> Many of our customers have entered into short-term contracts, with terms of one year or less, which do not provide for automatic renewal and require the customer to opt-in to extend the term. Our customers have no obligation to renew, upgrade, or expand their agreements with us after the terms of their existing agreements have expired. If one or more of our customers terminate their contracts with us, whether for convenience, for default in the event of a breach by us, or for other reasons specified in our contracts, as applicable; if our customers elect not to renew their contracts with us; or if our customers renew their contractual arrangements with us for shorter contract lengths or for a reduced scope; our business and results of operations could be adversely affected. This adverse impact would be even more pronounced for customers that represent a material portion of our revenue or business operations.

51. The Prospectus also included vague, boilerplate disclosures regarding risk factors that could hypothetically adversely affect the Company and its investors, including the following:

> ***Volatility in the price of our Ordinary Shares may subject us to securities litigation.***
>
> The market for our Ordinary Shares may have, when compared to seasoned issuers, significant price volatility and we expect that our share price may continue to be more volatile than that of a seasoned issuer for the indefinite future. In the past, plaintiffs have often initiated securities class action litigation against a company following periods of volatility in the market price of its securities. We may, in the future, be the target of similar litigation. Securities litigation could result in substantial costs and liabilities and could divert management's attention and resources.
>
> * * *
>
> ***We may experience extreme stock price volatility unrelated to our actual or expected operating performance, financial condition or prospects, making it difficult for prospective investors to assess the rapidly changing value of our Ordinary Shares.***
>
> Recently, there have been instances of extreme stock price run-ups followed by rapid price declines and strong stock price volatility with a number of recent initial public offerings, especially among companies with relatively smaller public floats. As a relatively small-capitalization company with relatively small public float, we may experience greater stock price volatility, extreme price run-ups, lower trading volume and less liquidity than large-capitalization companies. In particular, our Ordinary Shares may be subject to rapid and substantial price volatility, low volumes of trades and large spreads in bid and ask prices. Such volatility, including any stock-run up, may be unrelated to our actual or expected operating performance, financial condition or prospects, making it difficult for prospective investors to assess the rapidly changing value of our Ordinary Shares.
>
> In addition, if the trading volumes of our Ordinary Shares are low, persons buying or selling in relatively small quantities may easily influence prices of our Ordinary Shares. This low volume of trades could also cause the price of our Ordinary Shares to fluctuate greatly, with large percentage changes in price occurring in any trading day session. Holders of our Ordinary Shares may also not be able to readily liquidate their investment or may be forced to sell at

> depressed prices due to low volume trading. Broad market fluctuations and general economic and political conditions may also adversely affect the market price of our Ordinary Shares. As a result of this volatility, investors may experience losses on their investment in our Ordinary Shares. A decline in the market price of our Ordinary Shares also could adversely affect our ability to issue additional Ordinary Shares or other securities and our ability to obtain additional financing in the future. No assurance can be given that an active market in our Ordinary Shares will develop or be sustained. If an active market does not develop, holders of our Ordinary Shares may be unable to readily sell the Ordinary Shares they hold or may not be able to sell their Ordinary Shares at all.

52. With respect to the reasons behind the Company's IPO, the Prospectus stated the following regarding its intentions post-IPO and how it would use the IPO net proceeds:

> We estimate that we will receive net proceeds from this offering of approximately US$7.9 million, or approximately US$9.3 million if the underwriter exercises its option to purchase additional Ordinary Shares in full, after deducting underwriting discounts and commissions and the estimated offering expenses payable by us. These estimates are based upon an initial offering price of US$4.00 per Ordinary Share.
>
> The primary purposes of this offering are to create a public market for our shares for the benefit of all shareholders, retain talented employees by providing them with equity incentives and obtain additional capital. We plan to use the net proceeds of this offering as follows:
>
> ○ 10% of the net proceeds for expanding service capabilities and R&D;
>
> ○ 10% of the net proceeds for marketing and branding;
>
> ○ 50% of the net proceeds for potential mergers and acquisitions although we have no commitments with respect to any such acquisitions at this time; and
>
> ○ the remainder for working capital and other general corporate purposes.
>
> The foregoing represents our current intentions based upon our present plans and business conditions to use and allocate the net proceeds of this offering. Our management, however, will have

> significant flexibility and discretion to apply the net proceeds of this offering. If an unforeseen event occurs or business conditions change, we may use the proceeds of this offering differently than as described in this prospectus. See "Risk Factors — Risks Related to the Ordinary Shares and This Offering — We have broad discretion in the use of the net proceeds from this offering and may not use them effectively."
>
> Pending any use described above, we plan to invest the net proceeds in short-term, interest-bearing, debt instruments or demand deposits.

53. The statements identified above in paragraphs 46 through 52 were and are false and misleading because the statements failed to disclose that: (1) CHOW was the subject of a market manipulation and fraudulent promotion scheme involving social-media based misinformation and impersonators posing as financial professionals; (2) CHOW's public statements and risk disclosures omitted any mention of the risk of fraudulent trading or market manipulation used to drive the Company's stock price; (3) which, as a result, put CHOW securities at unique risk of a halt in trading by NYSE American and severe volatility-induced decline, resulting in heavy investor losses; (4) the sole underwriter for the IPO, Tiger Securities, had been fined and censured by FINRA in April 2025, just months before the IPO, for failing to have a reasonable system in place to identify potentially suspicious deposits of low-priced securities and was connected to a number of similar foreign microcap companies whose stock price collapsed due to market manipulation; (5) the Company's statements significantly overstated the legitimacy of the Company's operations and customer base; and, (6) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

54. Each of the Individual Defendants signed the Registration Statement. The Prospectus contains the signature of the Auditor Defendant with respect to its opinion and report on the Company's financial statements. The Prospectus identifies Tiger Securities as the

"underwriter" for the IPO and Tiger Securities was a party and the sole signatory to the Underwriting Agreement, which was submitted as Exhibit 1.1 to the Form F.1/A Registration Statement filed by the Company on September 2, 2025, mere weeks before the Company's IPO. The Underwriting Agreement expressly provides in pertinent part in Section 4(b) under the heading Covenants of the Company that:

> During the period beginning on the date hereof and ending on the later of the Closing Date or such date as, in the reasonable opinion of Underwriters' Counsel, the Prospectus is no longer required by law to be delivered (or in lieu thereof the notice referred to in Rule 173(a) under the Securities Act is no longer required to be provided) in connection with sale by an underwriter or dealer (the "**Prospectus Delivery Period**"), prior to amending or supplementing the Registration Statement, the Disclosure Materials or the Prospectus, the Company shall furnish to the Underwriters and Underwriters' Counsel for review a copy of each such proposed amendment or supplement, and the Company shall not file any such proposed amendment or supplement to which the Underwriters reasonably object.

Accordingly, the Underwriter Defendant had the opportunity to review the Registration Statement and Prospectus publicly filed with the SEC.

55. The Underwriter and Auditor Defendants would have uncovered the false and misleading statements with adequate due diligence. Indeed, a simple review of the Company's website, as well as Sereno's website, would have uncovered several irregularities that would have put an auditor and/or underwriter on notice that the Company's operations might not be wholly legitimate and/or consistent with what was portrayed in the Offering Documents.

56. For instance, CHOW's website – www.chowchowcloud.com – was registered approximately five months before the IPO, on or around April 4, 2025. Outside of the Investor Relations section of the website linking to the Company's public filings, there is no substantive information regarding the Company's product and services offered aside from images identifying

generalized categories of offerings and industries the Company purports to serve, such as the below:

## Our Core Services

We provide a comprehensive suite of cloud services designed to meet the diverse needs of modern businesses across various industries.

### Cloud Infrastructure

Scalable and reliable cloud infrastructure solutions designed for modern businesses.

- Auto-scaling capabilities
- High availability
- Global CDN
- Load balancing

### Managed Services

Comprehensive managed services to handle your IT operations and maintenance.

- 24/7 monitoring
- Automated backups
- Performance optimization
- Security updates

### Security Solutions

Enterprise-grade security measures to protect your data and applications.

- Data encryption
- Access control
- Threat detection
- Compliance support

### Data Management

Advanced data management and analytics solutions for business intelligence.

- Data warehousing
- Real-time analytics
- Data migration
- Backup & recovery

### Network Solutions

Robust networking solutions for seamless connectivity and communication.

- VPN services
- Network optimization
- Bandwidth management
- Connectivity solutions

### Performance Optimization

Advanced optimization techniques to maximize your system performance.

- Performance monitoring
- Resource optimization
- Speed enhancement
- Efficiency improvements




57. Indeed, one day before the IPO, on September 15, 2025, CHOW published its one and only news announcement, which appears on the website and reads as follows:

> **ChowChow Cloud Expands Operations**
>
> ChowChow Cloud announces significant expansion of its cloud infrastructure services to better serve growing client demands across Hong Kong and international markets.
>
> ChowChow Cloud International Holdings Limited is pleased to announce a major expansion of its cloud infrastructure services. This strategic initiative will enhance our ability to serve growing client demands across Hong Kong and international markets.
>
> The expansion includes upgraded server capacity, enhanced security protocols, and improved service reliability. Our team has been working diligently to ensure seamless service delivery during this transition period.
>
> This development reinforced ChowChow Cloud's commitment to providing world-class cloud solutions and maintaining our position as a leading provider in the industry.

58. Sereno's website – www.serenoclouds.com – is referenced in the Prospectus but disclaimed as being part of the Prospectus. While exhibiting more layers and information than CHOW's website in that it includes product and service names and slides containing pricing information, the Sereno website is also deficient in a number of respects that should have triggered further inquiry and action from the Auditor and Underwriter Defendants. CHOW's website also contains no links that redirect to Sereno's website.

59. The Sereno website features a "Team" page, which includes Defendants Wing and Ming. Defendant Wing is the only team member with a photograph and is identified as being involved with "Business Development," a role he has held from "Nov 2014 – Present( 5 yrs 9 mos)" [sic]. Defendant Wing is the only member of the team with a link to his LinkedIn page. Defendant Ming, listed as "Paul Hui[,]" does not have an identified position, and his email address is misspelled. Aside from Defendants Wing and Ming, a reasonable search yielded no web presence for any of the remaining team members.

60. The Sereno website purportedly presents client testimonials that are seemingly placeholders, potentially AI-developed, but in any event, not testimony from actual customers because the purported persons cannot be identified following a reasonable search and have no affiliation with any of Sereno's purported clients, such as the below:




61. Worse, in another example, provided below, an unnamed Singapore team testimonial is signed by "Jacob Chow[,]" who states that Sereno has been rendering quality IT services to the unnamed team "since May 2003." This is blatantly false, however, because neither CHOW nor Sereno were established or operating in the corporate cloud framework decades ago. In fact, the testimonial predates the founding of the Company by over a decade.

> *"On behalf of the entire Singapore Team, I would like to express our sincre thanks for the technology support extended by your company. Therefore Sereno has been rendering quality IT services since May 2003 and has remained certainly consistant in their commitment to our company. So, keep up the good work!Most importantly we trust you."*
>
> JACOB - CHOW

62. Likewise, another testimonial from an unaffiliated person purportedly named "Tom Tsang" shows characteristics of being a placeholder, rather than actual testimony, in that it contains numerous errors such as inconsistent capitalization and misspellings, and is provided below:

> *"Our work with sereno aimed to implement Enterprise Cloud and create a framework for how it could be used with SrerenoPro cloud secuirty service, cloud monitoring service and cloud managed service.Therefore we were very happy with the certainly experience we had with Sereno. Their expertise and know how of their team members as truely on asset."*
>
> TOM - TSANG

63. There are no testimonials from the key customers referenced in the Prospectus and all but two are completely absent from both websites aside from the links to the Company's SEC filings. For example, Motto Group Limited, which contributed 32.8% of CHOW's total revenue in 2023 and 12.1% in 2024, was a private company operating in the information technology and computer hardware supply industries. However, despite its identification as key customer and its contributions to CHOW, Motto Group Limited has no public website, online marketing presence, or information regarding its leadership. The Company was dissolved just four months after the IPO in January 2026.

64. Another key customer, Asia Top Loyalty Limited ("Asia Top"), which contributed 11.5% of CHOW's total revenue in 2023, was recently embroiled in a lawsuit (*Mu Tech Inc. v. Kok Yin*, No. 3:24-cv-01976-JAH-VET) and now arbitration alleging that members of Asia Top's Board of Directors set-up a shadow entity and stole trade secrets from Asia Top, leaving its solvency in question, a suspicion further confirmed by the shuttering of Asia Top's UK affiliate this year.

65. Further, Servicesky Limited ("Servicesky") contributed 17.9% of CHOW's total revenues in 2023 according to the Prospectus. Servicesky is a private company, which operates as a business-to-business information technology solutions and IT consulting proxy in Hong Kong. However, Servicesky has disappeared from CHOW's primary accounting logs and maintains zero verifiable localized corporate presence with no public website, no consumer marketing materials, and no independent public-facing software applications.

66. Additionally, Star-Tech Computing Limited ("Star-Tech"), which contributed 9.7% of CHOW's total revenue in 2024, is a private, Hong Kong-based business-to-business

computer hardware supplier and enterprise distributor. Star-Tech has no public-facing website and no operational footprint that can be deciphered aside from its relationship with CHOW.

67. Lastly, Conversant Technologies Pte. Ltd., ("Conversant"), which contributed 16.4% of CHOW's total revenues in 2024, is a private Singapore-based entity operating as an enterprise IT proxy and vendor. Conversant's solvency is questionable because on June 19, 2026, it was determined by Special Resolution that the corporate holding company for Conversant and associated entities – Conversant Partners Pte. Ltd. – "cannot by reason of its liabilities continue business." Conversant was formally placed into voluntary liquidation under the Singapore Insolvency, Restructuring and Dissolution Act. Additionally, Conversant's public-facing website no longer works. Accordingly, within a span of approximately nine months from the IPO, much of CHOW's pre-IPO revenue base, which was comprised of private entities with no meaningful web presence, was wiped away.

68. Indeed, only Conversant and Asia Top Loyalty are referenced on Sereno's "Client" webpage in a graphic with twenty-three other entities, which are mentioned nowhere in the Company's public filings or webpages. The image filename is "Sereno-Customer-Reference-2025." and is provided below:

Our Clients

Home / About Us / Our Clients

Client

Sereno has a comprehensive customer profiles and been continuously provided technical support to them




69. Neither CHOW's, nor Sereno's websites contain any video presentation or demonstration regarding the products and services. This renders CHOW an outlier amongst its industry peers. For instance, Cloudastructure, which trades OTC, is a micro-cap AI enterprise, which specializes in cloud-based video surveillance and building security, and has a regular video-based web presence in which management leads viewers through cloud dashboards and predictive analytics interfaces. Inseego Corp., which trades on NASDAQ, is another micro-cap technology company that regularly publishes testing videos and software walkthroughs on YouTube.

70. Indeed, the Company's low-float IPO carried all the "red flags" of a carefully designed vehicle for market manipulation. The scarce public float allowed for price manipulation because even modest buying pressure could create explosive price movement. Had the Underwriter Defendants conducted even basic due diligence, much less complied with the aforementioned due diligence FINRA requires, they would have uncovered this fraud at the outset and prevented the

IPO from ever happening. Likewise, had the Auditor Defendant conducted even basic due diligence, much less complied with the PCAOB standards it claimed, it would also have detected this obvious fraud preventing registration and sale of CHOW securities.

71. Further, Defendants violated Item 105 of Regulation S-K by failing to disclose, in plain English, the specific material risk factors that rendered the offering speculative and risky. These omitted risks included the likelihood of social media-driven "pump-and-dump" schemes and the Underwriter Defendants' systemic failures in AML compliance, supervision, and business-communication monitoring—failures that directly enabled manipulative trading and extreme volatility.

72. Defendants also violated Item 303 of Regulation S-K by failing to disclose known material trends and uncertainties that had, or that Defendants reasonably expected would have, a material unfavorable impact on net sales, revenues, or income from continuing operations. Specifically, Defendants were aware of impending "pump-and-dump" activities, and the Underwriter Defendants' systemic compliance deficiencies created a substantial likelihood of adverse effects on CHOW's financial condition and operations—including post-IPO price collapses, loss of investor confidence, regulatory scrutiny, and potential trading suspensions—yet Defendants failed to disclose these risks, in violation of Item 303.

73. Moreover, all Defendants were negligent in preparing the Registration Statement and in conducting due diligence in connection with the IPO. None of the Defendants made a reasonable investigation or possessed reasonable grounds for the belief that all material facts required to be disclosed in the Registration Statement were disclosed and that there were no untrue statements of material facts. The Underwriter Defendants had access to non-public information, including account-opening documentation, allocation records, and trading data reflecting

suspicious and coordinated patterns. Despite these red flags, Defendants conducted only cursory due diligence and failed to disclose the material facts described above. The Registration Statement failed to disclose that the Underwriter Defendants had not conducted reasonable due diligence. Defendants issued, caused, and participated in the issuance and dissemination of, the Registration Statement, which failed to disclose the omitted facts as stated above and included untrue statements of material fact in the Underwriting Agreement. By reason of the conduct alleged herein, each Defendant violated the Securities Act.

### C. Erratic Trading Volume in CHOW Following the IPO

74. The Company's low-float IPO left investors vulnerable to market manipulation and a "pump-and-dump" scheme. By offering just 2.6 million shares to the public, fraudulent actors were able to benefit from the scheme through offshore holding entities and affiliates. The scarce public float allowed for price manipulation because even modest buying pressure could create explosive price movement.

75. On its first trading day, September 16, 2025, the Company's ordinary shares opened for trading at double the IPO price, $8.00 per share, and then surged to an intraday high of $21.91 per share, before closing at $12.61 per share, more than triple the IPO price on volume of 1.4 million.

76. However, on September 17, 2025, CHOW's ordinary shares suffered a setback, declining from an opening price of $11.40 per share to a closing price of $8.50 per share, on trading volume of 245,100.

77. After the market closed on September 17, 2025, CHOW issued a press release announcing the closing of its IPO of 2.99M ordinary shares, including a 390,000 over-allotment, at a price of $4.00 per share for total gross proceeds of $11.96M. The press release also identified Defendant Tiger Securities as the sole book-running manager for the offering. The press release

did not mention anything regarding the extreme price activity or heavy trading volume seen in the stock's activity in the first two trading days.

78. The price decline continued over the next two trading days. On September 18, 2025, CHOW's stock price declined from an opening price of $8.50 per share down to $5.38 per share at closing, on trading volume in excess of 900,000. Finally, on September 19, 2025, CHOW's stock price bottomed out from its initial surge closing at $5.01 per share, on trading volume of over 1.7 million.

79. Following the IPO, the initial surge and decline in the Company's stock, trading volume in CHOW plummeted. From the next trading day, September 22, 2025, through September 29, 2025, CHOW's daily trading volume averaged just under 210,000 per day, with CHOW's stock closing at $5.31 per share on September 29, 2025.

80. Then, on September 30, 2025, CHOW's stock price surged to an intraday high of $7.62 per share before closing at $6.49 per share, on trading volume of 888,900 – more than a four-fold increase from the average trading volume the week prior. Next, on October 1, 2025, CHOW's stock price surged again to an intraday high of $8.00 per share and a closing price of $7.10, on trading volume over one million – a nearly five-fold increase from the average trading volume from September 22, 2025, through September 29, 2025. This two-day surge in volume caused CHOW's stock price to rise more than 33% over the two trading days. For the next two weeks, the Company's ordinary shares fluctuated in that range, with trading volumes between a high of 759,000 on October 2, 2025, and a low of 401,700 on October 13, 2025.

81. Subsequently, after reaching an intraday high price of $9.44 per share on October 15, 2025, on trading volume of 756,800, the Company experienced a collapse in volume on October 16, 2025, with the stock price shrinking to $6.85 per share, on trading volume of just

66,700 – a more than eleven-fold decrease from the prior day. From October 16, 2025, through October 22, 2025, encompassing five trading days, the average trading volume of CHOW ordinary shares was just 65,460, with CHOW's stock price declining to a closing price of $6.25 per share at closing on October 22, 2025.

82. Then, on October 23, 2025, in the absence of any news regarding or filing from the Company, CHOW's stock price began to climb, reaching an intraday high of $7.51 per share and closing at $7.07 per share, on trading volume of 424,600 - a more than six-fold increase in the trading volume from the average of the five trading days prior.

83. On October 24, 2025, the Company's stock pushed higher again with an intraday high of $8.32 per share and closing at $7.96 per share, on trading volume of 413,700 - which again represented a six-fold increase in the daily trading volume from October 16, 2025, through October 22, 2025. Trading volume would continue to push the stock higher over the next week with CHOW shares reaching an intraday high of $10.22 per share and closing price of $9.90 per share on October 29, 2025, on trading volume of 446,700. Then, on October 30, 2025, the Company's stock price would reach an intraday high of $11.00 per share before declining to $9.46 per share at closing, on 434,800 trading volume.

84. At that point, on October 31, 2025, CHOW's stock price declined to a closing price of $8.42 per share and sunk as low as $8.30 per share, on volume exceeding 1.4 million. The trading volume on October 31, 2025, represented more than a twenty-one-fold increase compared to average trading volume from October 16, 2025, through October 22, 2025, despite no material news about or filings from the Company. From that date forward through the end of the Class Period, CHOW's ordinary shares would never have a daily trading volume beneath 358,200.

### D. Market Manipulation Scheme Drives CHOW's Volume and Stock Price Activity

85. Although public filings and news were scarce, a coordinated effort was made on social media and messaging applications, such as WhatsApp, to "pump" the price of CHOW's ordinary shares led by stock promoters illegitimately posing as financial advisors. Based on information and belief, these stock promoters used aliases and false photographs to conceal their true identities and were key cogs in the stock manipulation scheme surrounding CHOW, along with Defendants identified herein.

86. These stock promoters targeted investors on social media via advertisements and posts, which solicited them to join a stock trading and tips "groups" on messaging applications. After an initial solicitation, when an investor contacted the group about joining, a stock promoter posing as a financial advisor would tout prior returns to convince the investor to follow their advice and join the group. Along with touting these results, the stock promoters advertised new investment opportunities, such as CHOW, and emphasized the expectation that investment would return profits of "120%-150%."

87. Once the investor joined the group, a stock promoter, posing as a financial advisor, would provide false and misleading information regarding the Company's stock and its potential, and encourage the investor to "maximize" their funds to achieve the largest profit. When investors confirmed that they purchased stock as instructed by the stock promoters, the stock promoter then instructed the investor to provide screenshots of their transactions illustrating their ownership of CHOW. For example, these messages from stock promoters included and were similar to the following:


10:52
84
33
+1 (636) 633-9741
CHOW ChowChow Cloud International
9.560 +0.080 +0.84%
Trading 12/08 09:59
24
Trade
High 9.560
Low 9.490
Avg. Price 9.554
Amplitude 0.74%
Turnover Ratio 0.52%
52wk High 21.910
52wk Low 4.000
Historical High 21.910
Historical Low 4.000
Open 9.555
Prev Close 9.480
P/E (TTM) 222.32
P/E LYR 222.32
P/B 187.449
Bid/Ask Ratio -66.67%
% Volume 1.15
Dividend TTM --
Div Yield TTM --
Volume 55.35K
Turnover 528.82K
Market Cap 335.55M
Shares 35.1M
Float Cap 101.75M
Shs Float 10.64M
Min Trading Unit 1Share
🔥 🔥 VIP Quantitative Trading Strategy 🔥 🔥
Stock Code: CHOW
ISIN: KYG2124J1085
Purchase Price: Buy at Market Price
Number of Shares to Purchase:
Final Profit: 120%–150%
Please purchase directly at the market price. The stock price is




88. These stock promoters also provided investors with memoranda concerning CHOW, which were materially false and misleading. For example, one memorandum told investors that CHOW was fundamentally strong and poised for growth stating, in pertinent part, that: "From a fundamental perspective, [CHOW] has not only established a strong presence in the

local market through diversified business development, but has also achieved significant results in expanding into multiple strategic regions. During 2024-2025, the company recorded stable revenues across several Asia-Pacific markets, and the European and American markets will become major areas of strategic deployment in 2026." Furthermore, in their memoranda, the so-called "advisors" would support these claims by indicating that the "advisors" would "***conduct in-depth engagements with [CHOW's] [B]oard [of Directors] and senior management*** to learn about its current revenue situation and future development scope." (Emphasis added.) The memoranda solicited investment in CHOW, touting an expected "investment return target of 120%-150%[,]" a "forecast range" described as "entirely reasonable."

89. Following the "in-depth engagements with [CHOW's B]oard [of Directors] and senior management[,]" the stock promoters provided another memorandum, which included detailed information about the Company's "Revenue Growth Engines[,]" "Global Business Expansion Strategy[," and "Capital Operations to Drive Growth[.]"

90. This memorandum discussed CHOW's "Revenue Growth Engines" including the intention to add "value added services including 'AI operations monitoring' and 'cost optimization analysis' raising single-customer ARPU (average revenue per use) from approximately USD 100,000 in 2025 to USD 250,000 by 2028." Further, the memorandum emphasized the plan to "[d]evelop an 'intelligent cloud resource scheduling platform,' utilizing AI algorithms to achieve automatic server load optimization and fault prediction, raising gross margin to over 60%."

91. According to the memorandum, the Company's "Global Business Expansion Strategy" included the intention "[i]n 2026, [to] establish a European headquarters in London, UK, with a focus on serving small and medium-sized businesses (SMBs) and cross-border e-commerce clients," "'indirect entry'" in the U.S. "through local partners" by forming "strategic alliances with

U.S. small and medium-sized cloud consulting firms (such as Cloudreach, which specializes in vertical industries), providing them with Asia-Pacific cross-region service support while leveraging their channels to enter the U.S. market[,]" and the implementation of a "'3+2+N' strategy" in the Asia-Pacific region aimed at "[d]eep cultivation of three core markets … in Hong Kong, Singapore, and Australia," "[b]reakthrough[s] in two potential markets" via "[f]ocused entry into Indonesia and Vietnam" by "leveraging local digital economy policy dividends[,]" and penetration into "emerging markets" like "Malaysia, Thailand and other markets through a 'light-asset cooperation model.'"

92. The memorandum also explained how CHOW would use "Capital Operations to Drive Growth" through "Strategic Financing[,]" "M&A Integration[,]" "M&A Synergy Effects" and "Exploration of Top-tier Partnerships[,] and "ESG Value Realization." Specifically, the memorandum explained that the Company aimed to "[i]mplement a dual-track strategy of 'targeted acquisitions + ecosystem synergy' in 2027-2028, reaching deep strategic cooperation with well-known industry peers to achieve mutual growth through resource exchange[.]" The Company's strategies included "[r]apidly obtain[ing] international certifications such as ISO 27701 through acquisitions" and "converting target customers into CHOW 'basic services + value -added solutions' composite users, with a goal of achieving a 35% customer conversion rate with 12 months post-acquisition."

93. Based on these plans, the memorandum predicted that "[b]y focusing on 'globalization + differentiation + technological upgrade,' [CHOW] is expected achieve leapfrog growth in market capitalization and revenue over the next 3-5 years, becoming a leading cloud solutions provider in Asia-Pacific with a global presence."

94. Further, despite the extreme and eccentric pricing and volume activity in the Company's stock, and an advertised stock promotion campaign targeting stocks similar to CHOW, Defendants did not warn investors of the materialized risk that CHOW's ordinary shares were the subject of a market manipulation scheme designed to "pump and dump" the Company's shares and leave investors with staggering losses.

**E. Regulators Amp Up Protections and Take Aim at Companies Similar to CHOW**

95. While the market manipulation scheme was being launched and in the weeks leading up to and following CHOW's IPO, regulators were aligning their efforts to curtail manipulation on U.S. stock exchanges, signaling yet another red flag to Defendants.

96. On September 3, 2025, NASDAQ issued a press release entitled "NASDAQ PROPOSED CHANGES TO ITS LISTING STANDARDS[,]" in which NASDAQ announced proposals aimed at regulating micro-cap, low public float companies, like CHOW, which had increasingly become vehicles of fraud. The press release stated the following in pertinent part:

> Today, Nasdaq proposed a new set of enhancements to its initial and continued listing standards, reinforcing its long-standing commitment to capital formation while ensuring investor protection and upholding market integrity. These proposed updates introduce enhanced requirements for minimum company public float and capital raised during initial public offerings, alongside stricter suspension and delisting procedures for companies failing to meet Nasdaq's continued listings standards.
>
> The revised standards include:
>
> - A $15 million minimum market value of public float, applicable to new listings on Nasdaq under the net income standard.
> - An accelerated process for suspending and delisting companies with a listings deficiency that also have a Market Value of Listed Securities below $5 million.

- A $25 million minimum public offering proceeds requirement for new listings of companies principally operating in China.

"***Investor protection and market integrity are central to Nasdaq's mission***," said John Zecca, Executive Vice President and Global Chief Legal, Risk & Regulatory Officer. "These enhancements reflect our ongoing commitment to evolve our standards in step with market realities and to lead by example in promoting fair and orderly markets. By increasing our standards for the minimum public float and the public offering raise in certain new listings, it provides a healthier liquidity profile for public investors, while still making emerging companies available to investors through our exchange. These new listing standards represent one step in a necessary, industry-wide effort—alongside regulators, U.S. exchanges, and market participants—to closely examine trading behaviors in small company securities, with the goal of safeguarding market integrity and enhancing protections for investors."

***The actions announced today follow Nasdaq's proactive review of trading activity, particularly emerging patterns associated with potential pump-and-dump schemes in U.S. cross-market trading environments.*** The proposed updates are also reflective of how market dynamics and company valuations have evolved over time, prompting the need to recalibrate Nasdaq's minimum liquidity standards to suit today's environment. These enhancements ensure that the thresholds for public listings remain relevant and effective as markets evolve.

As part of these changes, Nasdaq is reintroducing a minimum public offering proceeds requirement specifically for companies principally operating in China, building on previous standards set for "restrictive markets," in which the Public Company Accounting Oversight Board (PCAOB) could not inspect auditors.[1] By applying this threshold, Nasdaq strengthens investor protections and enhances the liquidity profile of companies to reflect today's market environment.

In addition to the enhanced listing standards, ***Nasdaq will continue to actively refer cases to the Securities and Exchange Commission (SEC) and the Financial Industry Regulatory Authority (FINRA) on potentially manipulative trading activities, while strengthening our cooperation with both domestic and international regulators to reinforce effective oversight and maintain high standards across U.S. markets.***

(Emphasis added.)

97. On September 5, 2025, the SEC issued a press release announcing "the formation of a task force that will strengthen and enhance the Division of Enforcement's efforts to identify and combat cross-border fraud harming U.S. investors." In the release, the SEC explained, in pertinent part, that "[t]he Cross-Border Task Force will focus initially on investigating potential U.S. federal securities laws violations related to foreign-based companies, including potential market manipulation, such as 'pump-and-dump' and 'ramp-and-dump' schemes."

98. These developments signaling greater regulation of foreign microcap company public offerings likely triggered CHOW's efforts to expedite its IPO. Indeed, on September 11, 2025, Defendant Wing wrote to the SEC requesting "an acceleration of effectiveness" of the Registration Statement and stated that the Underwriter Defendants "joined in this request[.]" On that same date, Defendant Tiger Securities submitted their own correspondence to the SEC, signed by Managing Director Jack Ye, requesting the same "acceleration of the effective date[.]"

99. One day later, on September 12, 2025, the U.S. Department of Justice ("DOJ") issued a press release entitled "Co-CEO of Chinese Publicly Traded Technology Company and Financial Advisor Indicted for Over $100M Securities Fraud Scheme," which stated the following, in pertinent part:

> According to the indictment, Lai Kui Sen is the co-CEO of OST, and Yan Zhao, who goes by the aliases Hank Shi and Hank Shu, among others, is a financial advisor. ***OST is a Cayman Islands company with its principal operations in China***, that claimed to be a manufacturer of display modules used in consumer electronics, commercial LCD displays, and automotive displays. OST is publicly traded on NASDAQ and operated, at one point, with a variable interest entity (VIE) investment structure, which is often used by Chinese companies.
>
> According to the indictment, Sen, Zhao, and others allegedly engaged in a ***complex scheme to first provide a group of fifteen co-***

> ***conspirators with tens of millions of OST shares through two non-bona fide securities transactions.*** In one of these transactions, these co-conspirators paid nothing to OST for more than 70 million OST shares.
>
> The indictment alleges that, ***on April 15, 2025, the same day that the select investors received their first tranche of heavily discounted OST shares, a fraudulent campaign began to artificially inflate the price and trading volume of the OST stock. This included promoting the stock by impersonating real investment advisors, among others, promoting the stock on social media, and creating a false impression of market-wide buying momentum.*** To capitalize on OST's artificial price inflation and to harm the victim investors, Zhao and Sen facilitated the opening of brokerage accounts for certain select investors and orchestrated the selling of the shares that they had received either heavily discounted or for no remuneration. ***These sales generated substantial profits of approximately more than $110 million. Ultimately, according to the indictment, unwitting investors suffered significant losses when, on June 26, 2025, OST lost over $950 million in market capitalization, representing over 94% of its value.***
>
> (Emphasis added.)

100. On September 17, 2025, the SEC filed its Verified Opposition to Petitioner's Motion to Quash Subpoena under the Right to Financial Privacy Act of 1978 in the matter of *Peiyong v. U.S. Securities and Exchange Commission*, No. 1:25-mc-00350 (S.D.N.Y.) (ECF No. 7).[13] Therein, the SEC stated the following, in pertinent part:

> SEC Staff is investigating whether ***dozens of IPOs registered with the SEC and trading on U.S. exchanges between 2020 and 2025 (the "Relevant Offerings") were used as vehicles in a suspected IPO manipulation scheme ("Suspected IPO Manipulation Scheme") orchestrated by the persons and entities with ties to***

[13] On January 13, 2023, the SEC issued a Formal Order Directing Private Investigation and Designating Officers to Take Testimony in *In the Matter of Market Manipulation in Certain IPOs* (HO-14588) (the "Formal Order"). The Formal Order states that the SEC has information that tends to show that "U.S. Broker Dealers[,]" "Issuers[,]" "Hong Kong Broker-Dealers[,]" and "other persons and entities" may have been or may be engaging in violations of the federal securities laws including Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

> ***Hong Kong and China (the "Syndicate").*** In the days, weeks, and/or months following its IPO, each issuer's securities ***experienced unusual, extreme, and unexplained price movements, generally consisting of a large upward price spike followed by a drop to a price far below the high and often below the offering price.*** Today, these issuers' securities typically trade at a fraction of the offering price.
>
> SEC Staff's investigation indicates that ***the unusual price movements following the Relevant Offerings may have resulted from illegal market manipulation that the Syndicate orchestrated.*** Specifically, SEC Staff has information that tends to show that:
>
> - individuals and entities affiliated with the Syndicate acquired most of the issuers' public float by purchasing shares in many Relevant Offerings;
>
> - shortly after the Relevant Offerings, anonymous third parties on the Internet convinced investors to purchase the issuers' securities at prices substantially higher than they were offered; and
>
> - the accounts under the Syndicate's control that participated in the Relevant Offerings sold the issuers' shares at a significant profit into the bubble the solicitations created.
>
> (Emphasis added.)

101. Later, on October 7, 2025, United States District Court Judge Dale E. Ho denied the Motion to Quash and granted enforcement of the subpoena. In his Memorandum Order, Judge Ho explained that the SEC clearly linked the petitioner to its investigations, noting that the petitioner "appears to have also received significant proceeds from the Suspected IPO Manipulation scheme from other suspected [scheme] members," including "an entity in which [he] purchased a 40% ownership interest in," and that one alleged entity connected with the scheme "disbursed a significant portion of . . . funds to other accounts related to Petitioner," including "one of [his] personal bank accounts."[14] *Peiyong*, (ECF No. 8).

[14] At this time, Plaintiff lacks sufficient information linking Han Peiyong or his affiliates directly to CHOW and accordingly, cannot name Mr. Peiyong in connection with this Complaint.

102. Accordingly, regulators identified companies with a similar profile to CHOW - recently IPOed, micro-cap companies with ties to Singapore and Hong Kong, and miniscule public floats - as, at minimum, problematic for investors and, at most, vehicles specifically designed to deceive investors, commit securities fraud, and manipulate the market. Further, the SEC and DOJ are actively investigating and pursuing enforcement proceedings against potential co-conspirators and perpetrators of securities fraud via an IPO stock manipulation scheme similar to that alleged herein.

103. Despite heightened regulatory activity with respect to similar stocks and activity within those stocks, Defendants were silent on the materialized risk that CHOW's ordinary shares were the subject of a market manipulation scheme designed to "pump and dump" the Company's shares and leave investors with staggering losses.

104. Indeed, the Company's last public filing during the Class Period came on October 31, 2025, when CHOW filed a Current Report on Form 6-K announcing that Chang Hong-Ze was appointed as an executive director of the Company. From that date through to the end of the Class Period, the Company and the Individual Defendants were radio silent on the manipulation of the Company's stock despite record-breaking and erratic trading volumes.

### F. A Company Connected to Tiger Securities is Halted from Trading and De-Listed from NASDAQ

105. On or around May 5, 2025, SDM, a Cayman Islands holding company with significant ties to both Singapore and Hong Kong, conducted its IPO of 1.5 million ordinary shares

However, discovery could yield more information regarding Mr. Peiyong's (or others') involvement in the alleged violations of law specific to CHOW and in turn, Mr. Peiyong and/or his affiliates (or other similar persons and affiliates) could be named as a Defendant or Defendants in an amended pleading.

at an offering price of $4.00 per share for a total capital raise of $6M. Defendant Tiger Securities was lead underwriter and book-runner in connection with the SDM IPO.

106. On September 26, 2025, SDM had its stock halted from trading by the NASDAQ at 9:34 AM due to volatility. NASDAQ permitted trading to resume at 10:49 AM. When SDM's stock resumed trading, its stock price plunged to just $2.27 per share before eventually closing at $1.85 per share, on record daily trading volume of 25.9M. On the crash, SDM's stock price lost 88% of its value from its prior day closing price of $13.61.

107. After the market's close on September 26, 2025, the SEC announced "the temporary suspension, pursuant to Section 12(k) of the Securities Exchange Act of 1934, of trading in the securities of [SDM][.]" The SEC explained that the temporary suspension was due to "potential manipulation in the securities of [SDM] effectuated through recommendations made to investors by unknown persons via social media to purchase the securities of [SDM], which appear to be designed to artificially inflate the price and volume of the securities of [SDM.]" The suspension of trading in SDM was ordered for the period from 4:00 AM EST on September 29, 2025, through 11:59 PM EST on October 10, 2025.

108. On October 11, 2025, NASDAQ announced that trading in SDM would remain suspended pending receipt of "additional information requested from the company." Despite the Company's denial of involvement in market manipulation and statement that it intends to "fully cooperate with both the SEC and Nasdaq[,]" trading in SDM's stock remains halted by NASDAQ pending the information request, which was first issued on September 30, 2025. SDM never resumed trading and was delisted from NASDAQ in July 2026.

109. There are numerous similarities between CHOW and SDM. Both companies recently completed microcap IPOs and have ties to Singapore and Hong Kong. Both companies

have blatant inconsistencies between their public filings and websites. Both CHOW and SDM experienced price and volume spikes unrelated to any news about or filings by the respective companies. CHOW and SDM both retained auditors based in Singapore in connection with their IPOs. CHOW and SDM were both subject to a market manipulation scheme on social media aimed at "pumping and dumping" the respective stocks to the detriment of each company's investors. Both companies' investors suffered catastrophic losses following trading halts. Further, both CHOW and SDM had the same lead underwriter and book-runner in connection with their respective IPOs – Defendant Tiger Securities.

110. Despite the collapse and halting of SDM contemporaneous with the first weeks of CHOW's public trading and the obvious similarities between the two companies, especially with respect to the retention of Tiger Securities in connection with the respective IPOs, Defendants did not warn investors of the materialized risk that CHOW's ordinary shares were the subject of a market manipulation scheme designed to "pump and dump" the Company's shares and leave investors with staggering losses.

### G. CHOW's Ordinary Share Price and Volume Surge Before the Truth is Revealed

111. Over the twenty-four trading days between October 31, 2025, and December 5, 2025, the Company's ordinary shares had an average daily trading volume of 648,442. On December 5, 2025, the price of CHOW ordinary shares closed at $9.48 per share on trading volume of 527,000.

112. Then, on December 8, 2025, the price of CHOW ordinary shares surged to a closing price of $11.20 per share, a one-day increase of 18.1% despite the absence of any news relating to or any filing by the Company. Then-record trading volume of over nine million, a near fourteen-fold increase over average trading volume between October 31, 2025, and December 5, 2025,

drove the surge in stock price. One measure of stock trading volatility is float-to-trading-volume ratio, also known as float rotation or float turnover. A ratio above 1.0 (or 100% turnover) is indicative of high volatility in a stock. On December 8, 2025, CHOW ordinary shares experienced a ratio of 3.01.

113. The next day, on December 9, 2025, the Company's stock price increased again, gaining $0.50 per share and closing at $11.70 per share, on trading volume of over 6.5 million, its second largest daily trading volume day, even with no news or public filings from the Company. On this date, CHOW ordinary shares were again extremely volatile with a float turnover ratio of 2.18.

114. Defendants were silent again despite the surge in pricing activity and volume in the absence of any news concerning or filings by the Company. Defendants did not warn investors of the materialized risk that CHOW's ordinary shares were the subject of a market manipulation scheme designed to "pump and dump" the Company's shares and leave investors with staggering losses.

115. On December 10, 2025, the pump-and-dump scheme was revealed with catastrophic losses to investors. At approximately 11:05 AM EST, a surge of sell orders and volume of approximately 360,000 caused the price of CHOW ordinary shares to plummet from $11.95 per share to $10.59 per share in a span of mere minutes. At 11:07 AM EST, NYSE American halted CHOW ordinary shares from trading due to volatility. The halt remained in effect until 12.37 PM EST when the stock reopened for trading at the price of approximately $1.00 per share. NYSE American halted CHOW ordinary shares for a second time from 3:44 PM EST until 3:49 PM EST before ultimately closing at $1.83 per share, a single day loss of 84.3%. On this date, CHOW ordinary shares experienced just under 13.5 million in daily trading volume, an astonishing

float turnover ratio of 4.51. Since the end of the Class Period, Chow's stock has traded below $1.00 and presently trades at $0.44, well beneath the IPO price.

### H. Post-Class Period Revelations

116. On the next day, December 11, 2025, the Company issued a press release, stating that "the Company had become aware of unusual trading activity in its ordinary shares on the [NYSE American] on December 10 and December 11, 2025." CHOW also stated that it "made inquiries and has been unable to determine whether corrective actions are appropriate at this time." The Company then announced "that there has been no material development in its business and affairs not previously disclosed or, to its knowledge, any other reason to account for the unusual market action." Notably, the Company made no such announcements on days when the stock price surged on outsized, unexplained volume and only after a single-day collapse of 84.3%.

117. On December 31, 2025, CHOW issued a press release announcing its first half of 2025 unaudited financial results. Therein, the Company revealed an 81.3% rise in revenue to HK$178.2 million for the six months ended June 30 2025, compared to the same period in 2024, which "was primarily driven by certain closed CDN service and server farm projects secured from three new customers, which together contributed to approximately HK$83.5 million (US$10.7 million), represented approximately 46.9% of total revenue for the period." Despite the rise in revenue, the Company's net income of HK$12.5 million "was partially offset by an increase in accounts receivable and a decrease in deferred revenue." The release stated that "management is actively managing its outstanding accounts receivable and carefully planning its operations."

118. On April 30, 2026, CHOW filed a Notification of inability to timely file Form 20-F on Form NT 20-F. Therein, CHOW explained that it had "determined that it is unable to file its Annual Report within the prescribed time period without unreasonable effort or expense because

the Company requires additional time to review its financial statements to finalize the Annual Report."

119. Finally, on May 15, 2026, CHOW filed its Form 20-F for the 2025 fiscal year. Therein, CHOW revealed that "[t]here were three and five customers individually representing greater than 10% of gross accounts receivable of the Company as of December 31, 2024 and 2025 respectively" and that "total receivables from these customers accounted for approximately 56.3% and 80.8% of the Company's accounts receivable as of December 31, 2024 and 2025 respectively." There was no mention of any specific customers.

## V. AUDITOR DEFENDANT ALLEGATIONS

120. The Auditor Defendant certified in the Prospectus and as part of the Registration Statement that "[i]n our opinion, the consolidated financial statements present fairly, in all material respects, the financial positions of the Company as of December 31, 2024 and 2023 and the results of its operations and its cash flows for the years ended December 31, 2024 and 2023, in conformity with the accounting principles generally accepted in the United States of America." Additionally, the Auditor Defendant stated the following:

> Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statement. We believe that our audits provide a reasonable basis for our opinion.

121. In issuing its audit opinion on CHOW's financial statements, the Auditor Defendant failed to comply with U.S. Generally Accepted Accounting Principles ("GAAP") or the standards of the Public Certified Accounting Oversight Board ("PCAOB") requirements. These standards

required the Auditor Defendant to exercise due professional care in the performance of the audit and to obtain competent, sufficient evidentiary matter to form a basis for their opinion, and to obtain reasonable assurances that the financial statements were free from material misstatement, whether caused by error or fraud.

122. In conducting its audits, the Auditor Defendant had access to the files and key employees of the Company at all relevant times. The Auditor Defendant had continuous access to and knowledge of the Company's confidential internal, corporate, financial, operating and business information, and had the opportunity to observe and review CHOW's business and accounting practices, and to test the Company's internal accounting information and publicly reported financial statements. Accordingly, the Auditor Defendant was aware of the significant deficiencies at the Company. Thus, if the Auditor Defendant had complied with PCAOB standards, it would have determined that there was no reasonable basis for its audit report because, among other things, the Auditor Defendant was aware of undisclosed facts tending to seriously undermine the accuracy of its audit report and conformity with GAAP and the Company's reported financial metrics.

## VI. CLASS ACTION ALLEGATIONS

123. Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of classes consisting of all persons and entities that purchased or otherwise acquired CHOW securities (i) pursuant or traceable to the September 16, 2025, IPO and (ii) between September 16, 2025, and December 10, 2025, inclusive, and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which the Defendants have or had a controlling interest.

124. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, CHOW's shares actively traded on the NYSE American. While the exact number of Class Members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of CHOW shares were traded publicly during the Class Period on the NYSE American. Record owners and other members of the Class may be identified from records maintained by CHOW or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

125. Lead Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

126. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

127. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether the federal securities laws were violated by Defendants' acts as alleged herein;

b. whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of CHOW; and

c. to what extent the members of the Class have sustained damages and the proper measure of damages.

128. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VII. UNDISCLOSED ADVERSE FACTS

129. The market for CHOW securities was open, well-developed, and efficient at all relevant times. As a result of these materially false and misleading statements and/or failures to disclose, CHOW securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired CHOW securities relying upon the integrity of the market price of the Company's securities and market information relating to CHOW and have been damaged thereby.

130. Throughout the Class Period, Defendants materially misled the investing public thereby inflating the price of CHOW securities, by publicly issuing false and/or misleading statements and/or omitting to disclose the material facts necessary to make Defendants' statements, as set forth herein, not false or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose adverse material information and/or misrepresented the truth about CHOW's business, operations, and prospects as alleged herein.

131. At all relevant times, the material misrepresentations and omissions particularized in the Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Lead Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or

misleading statements about CHOW's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company, its financial well-being, and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements and omissions during the Class Period resulted in Lead Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## VIII. LOSS CAUSATION

132. Defendants' wrongful conduct, as alleged herein, directly, and proximately caused the economic loss suffered by Lead Plaintiff and the Class.

133. During the Class Period, Lead Plaintiff and the Class purchased CHOW's securities at artificially inflated prices and were damaged thereby. The price of CHOW's securities significantly declined when the misrepresentations made to the market, and/or the information alleged to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## IX. SCIENTER ALLEGATIONS

134. As alleged herein, Defendants acted with scienter because Defendants: (1) knew that the public documents and statements issued or disseminated in the name of CHOW were materially false and/or misleading; (2) knew that such statements or documents would be issued or disseminated to the investing public; and (3) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding CHOW, their control over, and/or receipt and/or modification of CHOW's allegedly materially misleading

misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

## X. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

135. The market for CHOW's securities was open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, CHOW's securities traded at artificially inflated prices during the Class Period. Lead Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of CHOW's securities and market information relating to the Company, and have been damaged thereby.

136. During the Class Period, the artificial inflation of CHOW's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Lead Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about CHOW's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of CHOW and its business, operations, and prospects, thus causing the price of CHOW's securities to be artificially inflated at all relevant times, and, when disclosed, negatively affected the value of the Company's shares. Defendants' materially false and/or misleading statements and/or omissions during the Class Period resulted in Lead Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, and each of them has been damaged as a result.

137. At all relevant times, the market for CHOW securities was an efficient market for the following reasons, among others:

a. CHOW shares met the requirements for listing and were listed and actively traded on the NYSE American, a highly efficient and automated market; and/or

b. CHOW communicated with public investors through established market communication mechanisms, including through dissemination of press releases on national circuits of major newswire services and through other public disclosures.

138. As a result of the foregoing, the market for CHOW securities promptly digested current information regarding CHOW from all publicly available sources and reflected such information in CHOW's share price. Under these circumstances, all purchasers of the Company's securities during the Class Period suffered similar injury through their purchase of CHOW's securities at artificially inflated prices and a presumption of reliance applies.

139. A class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XI. NO SAFE HARBOR

140. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in purportedly forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of CHOW who knew that the statement was false when made.

## FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against CHOW and the Individual Defendants

141. Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

142. During the Class Period, Defendants CHOW and the Individual Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; and (ii) cause Lead Plaintiff and other members of the Class to purchase CHOW securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants and each defendant, took the actions set forth herein.

143. These Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for CHOW securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

144. These Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about CHOW's financial well-being and prospects, as specified herein.

145. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices and a course of conduct as alleged herein in an effort to assure investors of CHOW's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about the Company and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

146. Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management

team or had control thereof; (ii) each of these Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company or their business relationship in connection with the Company and its IPO, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections, internal controls and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of, and had access to, other members of the Company's management team, internal reports, and other data information about the Company's finances, operations, and sales at all relevant times, and/or were required to perform reasonable due diligence in connection with the IPO; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

147. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing CHOW's true financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' misstatements and/or omissions regarding the Company's business, operations, financial well-being and prospects, and exposure to material, realized risks throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

148. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, set forth above, the market price of CHOW securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiff and other members of the Class acquired CHOW securities during the Class Period at artificially inflated prices and were damaged thereby.

149. At the time of said misrepresentations and/or omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true. Had Lead Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that CHOW was experiencing, which was not disclosed by Defendants, Lead Plaintiff and other members of the Class would not have purchased or otherwise acquired their CHOW securities, or, if they had acquired such securities during the Class Period, they would not have done so at artificially inflated prices.

150. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

151. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

**Violation of Section 10(b) of the Exchange Act and Rules 10b-5(a) & (c) for Fraud in Connection with the Sale or Purchase of a Security Against CHOW, the Individual Defendants, the Auditor Defendant, and the Underwriter Defendants**

152. Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

153. During the Class Period, Defendants CHOW, the Individual Defendants, the Auditor Defendant, and the Underwriter Defendants directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly, or recklessly: (i) employed devices, schemes or artifices to defraud; and (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

154. These Defendants identified in connection with this Claim employed devices, schemes and artifices to defraud and deceive Class Period purchasers of CHOW securities by: (i) initiating, endorsing, executing and/or completing the IPO on CHOW's behalf and permitting trading in CHOW securities on a national securities exchange while knowing or acting in reckless disregard to the doubts surrounding the legitimacy of the Company's business; (ii) initiating, endorsing, executing and/or completing the IPO on CHOW's behalf and permitting trading in CHOW securities on a national securities exchange while knowing or acting in reckless disregard to the fact that CHOW was the target of a market manipulation and promotional scheme; and/or (iii) attempting to manufacture artificial inflation through dissemination of materials containing false and misleading statements and/or omitting material information.

155. At the time, Lead Plaintiff and other members of the Class were ignorant of the identified Defendants' deceptions. Had Lead Plaintiff and the other members of the Class and the

marketplace known the truth regarding the deceptive acts and schemes, Lead Plaintiff and other members of the Class would not have purchased or otherwise acquired their CHOW securities, or, if they had acquired such securities during the Class Period, they would not have done so at artificially inflated prices.

156. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5(a) & (c) promulgated thereunder.

157. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## THIRD CLAIM

### Violation of Section 20(a) of the Exchange Act Against the Individual Defendants, Tiger Holdings, Up Fintech Global, and Up Fintech

158. Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

159. The Individual Defendants, Tiger Holdings, Up Fintech Global, and Up Fintech acted as controlling persons within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the operations and intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the identified Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the entities that they control, including the content and dissemination of the various statements which Lead Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged to be misleading prior to and/or

shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercise the same.

160. Likewise, Defendants Tiger Holdings, Up Fintech Global, and Up Fintech as parent entities had direct and supervisory involvement in the day-to-day operations of Tiger Securities and therefore, had the power to control or influence the particular transactions giving rise to the securities violations alleged herein and exercise the same.

161. As set forth above, CHOW, the Individual Defendants, the Underwriter Defendants, and the Auditor Defendant each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, the Individual Defendants, Tiger Holdings, Up Fintech Global, and Up Fintech are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## FOURTH CLAIM

### Violation of § 11 of the Securities Act Against All Defendants

162. Lead Plaintiff repeats and realleges each and every allegation contained above, as if fully set forth herein.

163. This Cause of Action is brought pursuant to § 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against the Defendants identified above, and does not sound in fraud and does not allege fraudulent intent or scienter in connection therewith, which are not elements of a claim under § 11 of the Securities Act.

164. The Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements therein not misleading, and omitted to state material facts required to be stated therein.

165. The Defendants are strictly liable to the Lead Plaintiff and the Class for the misstatements and omissions.

166. None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true, without omission of any material facts, and were not misleading.

167. By reason of the conduct alleged herein, each Defendant violated, or controlled a person who violated, § 11 of the Securities Act.

168. Lead Plaintiff acquired CHOW ordinary shares pursuant or traceable to the Registration Statement.

169. Lead Plaintiff and the Class have sustained damages. The value of CHOW ordinary shares declined substantially subsequent to the IPO.

170. At the time of their purchases of CHOW ordinary shares, Lead Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein. Less than one year has elapsed from the time that Lead Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based, to the time that this action commenced. Less than three years have elapsed between the time the securities upon which this Cause of Action is brought were offered to the public and the time that this action was commenced.

## FIFTH CLAIM

**Violation of § 12(a)(2) of the Securities Act Against All Defendants**

171. Lead Plaintiff repeats and re-alleges each and every allegation contained above, as if set forth herein.

172. This Cause of Action is brought pursuant to § 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2) on behalf of the Class, against all Defendants.

173. By means of the defective prospectus, the identified Defendants promoted, solicited and sold CHOW ordinary shares to Lead Plaintiff and other members of the Class.

174. The Prospectus for the IPO contained untrue statements of material fact, and concealed and omitted material facts, as detailed above. Defendants owed Lead Plaintiff and the other Class members, who purchased CHOW ordinary shares pursuant or traceable to the prospectus, the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated, in order to make the statements therein not misleading. Defendants, in exercising reasonable care, should have known of the misstatements and omissions contained in the prospectus, as set forth above.

175. Lead Plaintiff did not know, nor in the exercise of reasonable diligence could Lead Plaintiff have known of the untruths and omissions contained in the Prospectus at the time Lead Plaintiff acquired CHOW ordinary shares.

176. By reason of the conduct alleged herein, Defendants violated § 12(a)(2) of the Securities Act. As a direct and proximate result of such violations, Lead Plaintiff and the other Class members who purchased CHOW ordinary shares pursuant or traceable to the prospectus, sustained substantial damages in connection with their purchases of the shares. Accordingly, Lead Plaintiff and other Class Members who hold CHOW ordinary shares pursuant to the Prospectus,

have the right to rescind and recover the consideration paid for their shares, and hereby tender their ordinary shares to Defendants sued herein. Class members who have sold their ordinary shares seek damages to the extent permitted by law.

## SIXTH CLAIM

### Violation of § 15 of the Securities Act Against CHOW, the Individual Defendants, Tiger Holdings, Up Fintech Global, Up Fintech, and the Agent Defendants

177. Lead Plaintiff repeats and re-alleges each and every allegation contained above, as if set forth fully herein.

178. This Cause of Action is brought pursuant to § 15 of the Securities Act against CHOW, the Individual Defendants, Tiger Holdings, Up Fintech Global, Up Fintech, and the Agent Defendants.

179. The Individual Defendants were controlling persons of CHOW, within the meaning of the Securities Act. By virtue of their positions as directors or senior officers of CHOW or Cogency, as alleged above, these Defendants each had the power to influence, and exercised the same, over the Company to cause it to engage in the conduct complained of herein. The Company controlled the Individual Defendants and all CHOW employees.

180. Cogency controlled De Vries, who signed the Registration Statement at the direction of Cogency, and all Cogency employees involved in the CHOW IPO, and De Vries acted on behalf of and controlled Cogency with respect to its involvement in connection with the particular transactions giving rise to the securities violations alleged herein.

181. Likewise, Defendants Tiger Holdings, Up Fintech Global, and Up Fintech as parent entities had direct and supervisory involvement in the day-to-day operations of Tiger Securities and therefore, had the power to control or influence Tiger Securities with respect to the particular transactions giving rise to the securities violations alleged herein and exercise the same.

182. The Individual Defendants each had a series of direct and indirect business and personal relationships with other directors, officers and major shareholders of CHOW. CHOW, the Individual Defendants, the Underwriter Defendants, and the Agent Defendants were culpable participants in the violations of §§ 11 and 12(a)(2) of the Securities Act alleged in the Fourth and Fifth Causes of Action above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

## XII. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

a. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

b. Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c. Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d. Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Lead Plaintiff hereby demands a trial by jury.

Dated: September 11, 2026

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

/s/ *Matthew M. Guiney*
Matthew M. Guiney
Patrick Donovan

Rourke C. Donahue
270 Madison Avenue
New York, NY 10016
Tel: (212) 545-4600
Fax: (212) 686-0114
guiney@whafh.com
donovan@whafh.com
donahue@whafh.com